(Nos. 65714, 70320 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GORDON "RANDY" STEIDL, Appellant.

*Opinion filed January 24, 1991.—Rehearing denied April 1, 1991.*

206

208

214

216

BILANDIC, HEIPLE and FREEMAN, JJ., took no part.

Charles M. Schiedel and Daniel D. Yuhas, Deputy Defenders, and Peter L. Rotskoff, Lawrence J. Essig and John J. Hanlon, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, and Amy Ratterree, law student, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Nathan P. Maddox, Assistant Attorneys General, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

The defendant, Gordon "Randy" Steidl (Steidl), and codefendant Herbert Whitlock (Whitlock) were indicted for the murders of Dyke and Karen Rhoads, by an Edgar County grand jury. Defendant's motion for a change of venue was allowed and thereafter the court granted defendant's motion to sever his case from that of Whitlock. The venue for the trial was moved to Vermilion County and Whitlock, who was tried first, was found guilty only of the murder of Karen Rhoads (see *People v. Whitlock* (1988), 174 Ill. App. 3d 749). After trial, a jury found defendant guilty of murder of both Dyke and Karen Rhoads. The State requested a hearing to determine if the death penalty should be imposed. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(d).) The same jury that convicted defendant found that he was eligible for the death penalty and further found that there were no mitigating factors sufficient to preclude a sentence of death. A sentence of death was imposed, and the sentence was stayed (107 Ill. 2d R. 609(a)) pending direct review by this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

While the original conviction was awaiting review in this court, defendant filed a post-judgment petition (Ill.

Rev. Stat. 1987, ch. 110, par. 2—1401 *et seq.*) in the circuit court, attacking his conviction of the murders of Dyke and Karen Rhoads and his sentence of death. The circuit court denied the petition. By order of this court, the appeal of the post-judgment petition (No. 70320) was consolidated with the pending direct appeal of defendant's conviction for murder and sentence of death (No. 65714).

The defendant raises the following issues pertaining to the guilt phase of his trial: (1) whether the State proved him guilty beyond a reasonable doubt; (2) whether he was denied a fair trial because of the prosecutor's late disclosure of statements made by his ex-wife; (3) whether the evidence as to drug transactions was sufficiently prejudicial to warrant a new trial; (4) whether he was denied his right to be present at every stage of the trial when the trial judge had an off-the-record conversation with the jury; (5) whether the trial court abused its discretion in denying the jury's request to review testimonial transcripts; (6) whether he was denied a fair trial by admission of hearsay statements made by his co-defendant; (7) whether the trial court's restrictions on his examination of witnesses denied him his right to a fair trial and due process; (8) whether he was denied his rights to a fair trial when testimony of a police officer which recounted a witness' statement was admitted; (9) whether he was denied a fair trial as a result of the prosecutor's remarks in closing argument; (10) whether he was denied a fair trial and due process as a result of the trial court's refusal to instruct the jury that testimony of a drug addict should be viewed cautiously; and (11) whether he was denied effective assistance of counsel.

The defendant also raises the following issues pertaining to the sentencing phase of his trial. He claims that he was denied: (1) a fair sentencing hearing when

prospective juror Mary Dalide was excused for cause; (2) a fair sentencing hearing by the trial court's failure to give his tendered instruction that he would receive a natural life sentence if death were not imposed; (3) a fair sentencing hearing because the evidence against him lacks the degree of certainty required for the imposition of the penalty of death; (4) a fair sentencing hearing as the death penalty is excessive and disproportionate when compared to co-defendant Whitlock's sentence of life imprisonment; (5) a fair sentencing hearing when the jury was instructed that sympathy was an improper consideration, but was not instructed that mercy could be considered; and (6) effective assistance of counsel at his sentencing hearing.

The defendant raises the following arguments pertaining to his petition for post-judgment relief: (1) whether under section 2—1401 of the Code of Civil Procedure a new trial should be ordered since there was no physical evidence and the occurrence witnesses made sworn, post-trial statements that either exculpate or exonerate the defendant; and (2) whether a new trial or new death penalty hearing should be had to determine the extent that a witness' testimony was based on pre-hypnotic recall. The defendant also challenges the constitutionality of the death penalty.

At the guilt phase of the trial, the following evidence was adduced. At 4:39 a.m. on July 6, 1986, firemen responded to a telephone report of a fire at a home in Paris, Illinois. Fire investigator Donald Tankersley testified that the fire was of an incendiary nature and set in two separate locations. Firemen found the bodies of Dyke and Karen Rhoads in an upstairs bedroom. Dyke Rhoads' naked body was found lying on his left side on the floor with his head near the opening of the bedroom door. Karen Rhoads' naked body was found on the floor near the foot of the bed, with a pillow covering her face.

Pathologist Dr. John Murphy testified as follows: that both of the victims died from stab wounds prior to the fire; that Dyke was stabbed 28 times, and all the wounds except for one were minor or superficial; and that the fatal wound on Dyke was approximately six inches below the armpit on the left side of the body. He also testified that Karen Rhoads was stabbed 26 times and that most of her wounds were minor or superficial except for two: one wound was like Dyke's, approximately six inches below the right armpit and six inches deep; the other wound extended through the windpipe and into the upper lobe of the left lung.

Dr. Murphy also testified that after an examination of a knife, which according to the testimony of Deborah Rienbolt (to be discussed later) was the knife used for the murders, he found it was compatible with all 28 wounds on Dyke's body and all 26 wounds on Karen's body. No physical evidence was found at the Rhoads house which connected either the defendant or Whitlock to the crime scene. State police forensic scientist Phillip Salles examined various bloodstains but was unable to make a conclusive determination regarding blood types. David Metzger, another forensic scientist with the State police, testified that some 40 hairs found at the scene were compatible with both Dyke and Karen Rhoads, and that no unaccounted-for hairs were present. There was no fingerprint evidence and State police serologist Debra Helton testified that there was no evidence of sexual assault to either body.

Gary Knight, a crime-scene technician for the Illinois State Police, testified that the heat and soot associated with the fire, as well as the water used to fight the fire, adversely affected efforts to determine what happened immediately before, during, and after the crime. The elements of the fire were particularly detrimental to the

discovery of latent fingerprints, bloodstains, and blood splatterings.

Deborah Rienbolt (Rienbolt) said that she took part, along with Whitlock and the defendant, in the killings, and she testified for the State as to events prior to and subsequent to the killings. She entered a plea agreement to concealment of a homicidal death, a Class 2 felony, was sentenced to five years in prison, and agreed to testify against both defendant and Whitlock. In her plea agreement, Rienbolt said that she altered the knife allegedly used to kill Dyke and Karen Rhoads by washing the knife clean of blood and picking the residual blood out of the cracks in the knife.

At trial, Rienbolt admitted to various criminal convictions, as well as to the fact that she was an alcoholic and had various drug dependencies. However, she stated that she had not taken any illegal drugs since being released from a drug treatment center, approximately two months prior to defendant's trial.

In response to a question, Rienbolt said that she knew both the defendant and Whitlock and that defendant and Whitlock ran around together, and did drug deals together. She also said that approximately one month before the murders, she heard Whitlock talk about drug transactions involving Dyke Rhoads and that she accompanied Whitlock to the Rhoads house a couple of times prior to July 1986. Although she did not go into the house with Whitlock, she said Whitlock's purpose was to talk to Dyke about drugs.

Rienbolt further testified that on July 4, 1986, she was with Whitlock at Jeanne's Place and that he asked her for her knife, and told her that Dyke Rhoads wanted "out of the drug deals." The following morning, she saw Whitlock and Dyke Rhoads at Jeanne's Place. Rhoads told Whitlock that "he wanted out." He then left the bar and returned a short time later and handed Whitlock

some money, but that Whitlock told Dyke "you don't get out that easy." Defendant was not present during any of these conversations.

Rienbolt also stated that she went to the Tap Room bar in Paris around 8:30 p.m. on July 5, after having smoked some marijuana. She said that Whitlock, defendant, and Darrell Herrington were in the bar. She also testified that Whitlock said that there would be a fire set out in the country to cover up another fire. While they were in the Tap Room, Whitlock was given a letter which he then burned with the red Bic lighter that he borrowed from her and never returned. A similar red Bic lighter was later found by police a few blocks from the Rhoads' house, and firemen believe that it may have been the one used to start the fire.

At around midnight on July 5, 1986, Rienbolt went to the American Legion Hall in Paris, but did not go inside. At the Hall, she met defendant and Whitlock. She stated that she left the Hall and went to the Rhoads house and that defendant's car was already there. She then went into the house through the back door and went up to the bedroom, where she saw a broken lamp. She said that defendant, Whitlock, and Dyke and Karen Rhoads were in the bedroom. Dyke was trying to get off the bed, stumbling to the door like he was trying to get away. She then went over to Karen Rhoads and held her down while Karen was screaming "Oh, my God. Oh, my God." Defendant and Whitlock prevented Dyke from escaping, as both stabbed him. Then defendant and Whitlock stabbed Karen and slashed her throat. Rienbolt said that she then got dizzy and does not remember exactly what happened that night.

The next morning, Rienbolt said, the defendant and Whitlock came to her house and returned the knife to her. She said that about six months later defendant and

Whitlock gave her "hush money" which she used to pay bills.

Darrell Herrington (Herrington) testified as follows: that he was present at the American Legion Hall with defendant and Whitlock; that the three of them drove to the Rhoads house and he fell asleep in the car while defendant and Whitlock went inside; that he then woke up to the sound of something breaking and went into the house, where he heard a woman scream "please don't kill me"; that when he got halfway up the stairs, he saw the defendant covered in blood and holding a knife; that defendant then took him up to the bedroom, where he tripped on a male body near the door; that he saw a female body also lying on the floor which he covered with a pillow; and that the defendant then threatened Herrington with the same result should he talk to anyone about what he saw. On cross-examination, Herrington admitted that he was an alcoholic, that he had made inconsistent statements to the police, and that on the day in question he had been drinking continuously between noon and midnight.

Both the State and the defendant presented witnesses to bolster or detract from the versions of events as alleged by Rienbolt and Herrington. Defendant took the stand in his own defense and claimed that he had never had any drug dealings with Dyke Rhoads and was not present at the Rhoads house on the night of the murders.

Both the defendant and the State presented witnesses who confirmed and refuted the defendant's alibi. Notably, Ferlin Lester Wells testified for the State, as follows: (1) that he and defendant were in adjoining cells in the Edgar County jail; (2) that defendant told him that he "supposed" that Dyke and Karen were killed because they went to Florida and bought drugs that they did not pay for; (3) that defendant told him that the

house was set ablaze to discourage future drug ripoffs; and (4) that defendant said he wanted to kill Herrington for coming forward. However, Wells said that defendant never directly told him that he was the one to actually kill Dyke and Karen Rhoads.

## THE TRIAL

Defendant first contends that the State failed to prove him guilty beyond a reasonable doubt. In support of this position, he asserts that his alibi defense was strong and corroborated, while the witnesses for the State were unconvincing. He argues that the State's case relies heavily on the testimony of both Rienbolt and Herrington which, he argues, was implausible and unbelievable in that: (1) it was inconsistent with their pretrial statements, with each other's testimony, and with other evidence presented at trial; (2) neither saw the other at the crime scene; (3) Rienbolt was an accomplice, a convicted felon, and a drug addict; and (4) Herrington was an alcoholic and, in the eight years preceding trial, was convicted five times for DUI and twice for deceptive practices. He additionally argues that the State's witnesses could have learned information from other sources because: (1) a police officer had pictures of the crime scene developed at a local K mart; (2) months before the trial, the Paris Beacon-News released details of the crime, including the prosecution's theory that drugs were the probable motive for the murders, that both victims had died from multiple stab wounds, and that the fire was a result of arson; and (3) the fire chief admitted that he did not issue a gag order regarding information about the murders, thus the witnesses could have learned details of the crime from firemen. Defendant additionally argues to various consistencies in his alibi and inconsistencies in the State's case.

. "A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) It is not the function of this court to retry a defendant when considering a challenge to the sufficiency of the evidence. (*Jimerson*, 127 Ill. 2d at 43.) Instead, determination of the weight to be given to witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the fact finder. (*Jimerson*, 127 Ill. 2d at 43.) On review:

> " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *** '[O]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through the legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.)" *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

It is axiomatic that the evidence to be reviewed on appeal must be the evidence presented to the fact finder at trial. Thus, although defendant relies on out-of-court inconsistent statements made by Rienbolt and Herrington, those remarks are not considered on review, as they were never entered into evidence. Applying the principles of review as previously set out, to the case before us, this court concludes that there was sufficient evidence to support defendant's conviction. All of the defendant's allegations of weakness in the State's case were made known to the jury. Furthermore, although the testimony of an accomplice may be viewed with suspicion, it may nevertheless be enough to sustain a con-

viction, even in the absence of corroboration. (*Jimerson*, 127 Ill. 2d at 44.) Similarly, although testimony of a narcotics addict must be viewed with caution, the testimony may be enough to sustain a conviction if credible in view of the surrounding circumstances. (*People v. Norman* (1963), 28 Ill. 2d 77, 82.) Thus, the testimony of Rienbolt could conceivably have been enough to sustain the conviction, as the jury could have found her to be credible. Finally, because the State offered plausible explanations for all evidentiary inconsistencies and shortcomings, and because the jury was made aware of such infirmities, we hold that sufficient evidence was produced for a jury to hold defendant guilty beyond a reasonable doubt.

The defendant next alleges that the State violated Supreme Court Rule 412(a) (107 Ill. 2d R. 412(a)) when it submitted to defendant on January 9, 1987, a statement made by defendant's ex-wife, concerning conversations between defendant and her.

Debra Steidl (Debra) was interviewed by the police on October 1, 1986, and again on February 20, 1987. Two days after defendant's trial began, on Saturday, June 6, 1987, the police interviewed Debra for a third time. She gave the police the following information which had not been previously known by the prosecutor or tendered to defense counsel in any previous discovery material. Debra said that: (1) in late May or early June of 1986, defendant told her that he was planning to drive a truck to Florida to pick up a shipment of cocaine, in a deal set up by Whitlock; (2) defendant later came into the bar where she worked and put a bag of cocaine and a pistol on the bar in front of her; (3) prior to the murders, defendant told her that something big was going to happen to "set Paris on its ear"; and (4) she twice accused defendant of killing Karen and Dyke Rhoads, to which defendant gave ambiguous responses. These statements were transcribed and delivered to defendant on June 9,

1987, and Debra testified to the aforementioned statements on June 10. The defendant objected to introduction of the statements, and the trial judge overruled the objections.

Supreme Court Rule 412(a)(ii) requires the State to disclose "any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements." (107 Ill. 2d R. 412(a)(ii).) This rule encompasses not only confessions, but any statements made to anyone that might have a bearing on the defendant's guilt or innocence. (*People v. Weaver* (1982), 92 Ill. 2d 545, 558.) "Compliance with the discovery provisions is mandatory, and is accomplished only if the State notified the defense of the alleged incriminating statement promptly *** and if the State used due diligence," to ensure that the defendant received the information. (*People v. Williams* (1981), 96 Ill. App. 3d 250, 252.) The only circumstance that excuses a failure to disclose is when the prosecutor is unaware of the existence of the statements prior to the trial and could not become aware through due diligence. *People v. Kradenych* (1980), 83 Ill. App. 3d 547, 554.

In *Kradenych*, the record clearly indicated that the prosecution became aware of the incriminating statements, made by the defendant to another party, on the eve of trial. These statements were furnished to defense counsel after the trial began, when the prosecution realized that it would be able to secure the presence of the witness at the trial. The defendant moved to exclude the witness' testimony because it was not disclosed during pretrial discovery. The appellate court held that although there may have been a day or two interval before the information was given to the defense, there was no indication of a lack of due diligence by the prosecution. *Kradenych*, 83 Ill. App. 3d at 554-55.

The case before us is quite similar to *Krandenych* except that the prosecutor in this case was contending with two back-to-back double-homicide trials in a different county (Whitlock's and defendant's), and Debra was not a witness in the first trial. Additionally, the fact that the prosecution interviewed Debra a third time, and had a typewritten statement delivered to defendant after only one business day had elapsed, shows that the State used all due diligence in providing the defense with Debra's statements. Thus, the prosecution did not violate Supreme Court Rule 412(a).

Defendant next argues that, since the evidence at trial was closely balanced, the error of the trial court in admitting testimony as to his alleged drug transactions was sufficiently prejudicial to warrant a new trial. Aside from Debra's statements about defendant's alleged drug transactions, defendant also maintains that the testimony of Penny Cash, defendant's ex-girlfriend, was prejudicial. Cash testified that in October 1986, defendant told her that he had in the past dealt cocaine to "all the bigwigs in Paris," and wanted to do so again.

As a general rule, evidence of other crimes is inadmissible if relevant merely to establish the defendant's propensity to commit crime, while it is relevant to show defendant's motive. (*People v. Stewart* (1984), 105 Ill. 2d 22, 56; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) The defendant argues that the evidence of his drug dealings was admitted solely to show he had a propensity to commit criminal acts, and any value that the evidence had to show motive is extremely slight.

The State alleges that the evidence is relevant to show defendant's motive and that the jury was properly instructed as to the limited purpose of the evidence. The State also argues that defendant waived any objections by his failure to object on those grounds at trial. "Generally, while any evidence which tends to show that an ac-

cused had a motive for killing *** is relevant, such evidence, to be competent, must at least to a slight degree tend to establish the existence of the motive relied upon." (*Stewart*, 105 Ill. 2d at 56.) Deborah Rienbolt's statements suggest that the reason for the killings was that Dyke Rhoads had told Whitlock that he wanted to get out of a drug deal. Evidence that the defendant was involved in drug dealings with Whitlock is clearly relevant to the establishment of a motive for defendant's involvement in the killings.

Concerning defendant's statements to Penny Cash that he dealt cocaine to all the "bigwigs" in Paris, defendant's objection to this testimony as improper "other-crime evidence" has been waived. When the testimony was presented at trial, defendant objected on the grounds of relevance, arguing that the statement was made two or three months after the murders. Having specified a ground for his objections at trial, defendant has waived on appeal any alternative objections not specified. *People v. Canaday* (1971), 49 Ill. 2d 416, 423-24.

As noted above, this evidence was introduced to show defendant's motive and the jury was properly instructed on the limited purpose for which the evidence was received. (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981) (hereafter IPI Criminal 2d).) Therefore, this court holds that the admission of evidence relating to defendant's alleged drug transactions was not error.

Defendant next contends that his rights to be present at every stage of the trial, to a fair trial, and to due process were denied when the trial court told the jury (off-the-record and during jury deliberations) that at approximately 6:30 p.m. their dinner was ordered, that phones would be made available at 8 p.m. for them to arrange for delivery of clothing and toilet articles to the hotel, and that at 10 p.m. they would be taken to the hotel if

they had not yet reached a verdict. As these comments were made off-the-record, the substance of the remarks was not written down until after the trial, in the defendant's post-trial motion for a new trial. At the hearing on the post-trial motion, the trial judge acknowledged that the defendant's post-trial motion accurately reflected his off-the-record exchange with the jury.

This court has previously considered the validity of a conviction where there has been a questionable communication by the trial judge to the jury. In *People v. Tobe* (1971), 49 Ill. 2d 538, 542-44, the court held that if there was a communication to the jury outside the presence of the defendant, and it is apparent that no prejudice resulted, the jury's verdict will not be set aside. See also *People v. Mills* (1968), 40 Ill. 2d 4, 14; *People v. Tilley* (1952), 411 Ill. 473, 478-79.

Thus, the defendant must show that the trial judge's statements prejudiced him when the jury was told about the time and arrangements surrounding their sequestration. In *People v. Derrico* (1951), 409 Ill. 453, the jury retired at 3:30 p.m. At 8 p.m., the trial judge told the jury that if it did not reach a verdict by 9 p.m., it would be sent to a hotel for the night. The jury asked for the time to be extended to 10 p.m., and then to 10:30 p.m. At 10:20 p.m., the jury asked the bailiff how much time was left, and then returned a verdict at 10:30 p.m. In that case the court held:

> "The trial court did not curtail the deliberations of the jury. All it did, in effect, was to inform the jury it would be accommodated in a hotel overnight for the opportunity of further deliberations the next day, rather than prolong the deliberations far into the night. It did not command, direct, or even request a verdict by a stated time." (*Derrico*, 409 Ill. at 464.)

In a similar context, in *People v. Baggett* (1983), 115 Ill. App. 3d 924, 930, the court stated that "[t]he trial

judge's comments had the effect of removing and not of creating *** pressure. Informing a jury that it might be sequestered cannot be considered coercive."

The defendant relies on *People v. Friedman* (1986), 144 Ill. App. 3d 895, 903, where the court held that a questionable judicial comment to a jury, followed by a brief deliberation, invites an inference that the trial court's remarks were coercive. However, in *Friedman*, the jury returned a verdict only five minutes after the trial judge made his questionable remark. (*Friedman*, 144 Ill. App. 3d at 903.) In the case before us, the jury deliberated for 45 minutes after it was told of the sequestration plans. In his ruling on defendant's post-trial motion, the trial judge stated that he was only giving the jury "timely notice" of the food and lodging arrangements. We agree. As this "timely notice" was followed by 45 minutes of further deliberations, it did not prejudice defendant's rights to a fair trial. He is therefore not entitled to relief on these grounds.

The defendant next contends that the circuit court abused its discretion in denying the jury's request to review testimonial transcripts. The jury began its deliberation at 12:36 p.m. At 4:13 p.m., the jury sent the following note to the judge: "Q: Do we have access to a copy of the transcript?" The following response was agreed to by the judge and attorneys for both defendant and the State, and submitted to the jury: "No transcripts are available. We may be able to respond to specific questions in a limited manner."

The decision whether or not to comply with the jury's request for testimonial transcripts rests within the sound discretion of the trial court. The trial court's decision will not be disturbed on review unless there was an abuse of discretion. (*People v. Franklin* (1990), 135 Ill. 2d 78, 105.) Furthermore, at the point in the proceedings when the jury asked for the transcript, the tran-

script for the *entire* trial was not yet available. The trial court used sound discretion by telling the jury that transcripts were not available, yet leaving open the possibility that it may be able to help the jury, should it have specific questions.

Defendant also contends that he was denied his rights to a fair trial and due process, and was prejudiced by the admission of statements made by defendant's co-conspirator, Whitlock. The statements that defendant objects to include a number of statements that Rienbolt said Whitlock had made to her. Whitlock's statements include: (1) that he told Rienbolt approximately one month before the murders that he had drug deals with Dyke Rhoads; (2) that he stated to Rienbolt that he told Karen Rhoads that he wanted "to get into her pants," and that Karen Rhoads slapped him; (3) that on the day before the murders, he asked Rienbolt for a knife and said that Dyke Rhoads wanted out of the drug deals; and (4) that he said "you don't get out that easy," after Dyke Rhoads gave him money and said he wanted out of the drug deals. At trial, defendant, on the grounds that he was not present, objected only to the first two statements. The objections were overruled and defendant now argues that further objections to statements (3) and (4) would have been futile.

This court will review only statements (1) and (2) for error, as objections to the other statements were not properly preserved for review. Defendant's futility argument is not persuasive, and statements (3) and (4) should have been objected to at trial. The failure to raise a contemporaneous objection waives an issue for review on appeal. (*People v. Davis* (1983), 95 Ill. 2d 1, 48.) Defendant also waived his objections to the statements because he did not include the objections in his post-trial motion for a new trial. *People v. Caballero* (1984), 102 Ill. 2d 23, 31.

The traditional formulation of the declarations of co-conspirator exception to the hearsay rule is that:

"such declarations are admissible against all conspirators upon an independent, *prima facie* evidentiary showing of a conspiracy or joint venture between the declarant and one of the other defendants, insofar as such declarations are made in furtherance of and during the pendency of the conspiracy, even in the absence of a conspiracy indictment." (*People v. Goodman* (1980), 81 Ill. 2d 278, 283.)

It has additionally been held that acts and declarations of participants in the conspiracy may themselves form an inferential basis for the existence of the conspiracy. *People v. Duckworth* (1989), 180 Ill. App. 3d 792, 795.

In the case before us, there was sufficient evidence to establish a *prima facie* showing of a joint venture or conspiracy between Whitlock and defendant, and thus Whitlock's statements are admissible as statements of a co-conspirator. The inferential evidence of the conspiracy that was introduced at trial includes: (1) Rienbolt's and Herrington's testimony that defendant and Whitlock travelled to the Rhoads house together, and there killed Dyke and Karen Rhoads; (2) testimony at trial that defendant and Whitlock were longtime friends and had participated in drug deals together; and (3) defendant's statements to his ex-wife, Debra, that he had to go to Florida to pick up cocaine in a deal that Whitlock had set up. The State met its burden of proving that defendant and Whitlock were involved in a conspiracy; thus, the co-conspirator exception applies to the admission of Whitlock's statements at defendant's trial, and it was not error to allow the testimony into evidence.

Defendant next asserts that he was denied his right to a fair trial and to confront witnesses against him when the trial court: (1) refused to allow him to inquire into Rienbolt's and Herrington's reputation in the com-

munity for truth and veracity; and (2) restricted his counsel's cross-examination of Herrington as to whether he had written any checks without sufficient funds after his 1981 and 1982 convictions for deceptive practices which were based on the writing of "bad checks."

To preserve an issue for review "[b]oth a trial objection and a written post-trial motion raising the issue are required." (Emphasis in original.) (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Defendant failed to raise the issue of the trial court's refusal to allow him to inquire into Rienbolt's and Herrington's reputation for truth and veracity in his post-trial motion, and has thus waived the issue.

On direct examination, Darrell Herrington testified that he had been convicted on two prior occasions, and that each was based on writing "bad checks." On cross-examination, defense counsel asked if Herrington had written any bad checks since his convictions. The prosecutor objected to the question. The objection was sustained without comment or argument from the defense. The questions on cross-examination then moved into a different area. In this court, for the first time, defendant argues that the question was asked not to challenge Herrington's credibility, but rather to show that he had some interest, motive, or bias to testify falsely. As noted above, *both* a trial objection *and* a written post-trial motion are required to challenge alleged errors that could have been raised during trial. (*Enoch*, 122 Ill. 2d at 186.) As this issue is being raised for the first time in this court, it has been waived.

Defendant next contends that his right to confront witnesses against him, to a fair trail, and to due process were violated when Paris police officer Jack Eckerty (Eckerty) was allowed to describe Herrington's out-of-court statement that the mattress in the victim's house

lay east and west. Defendant claims that the statements were hearsay and improper rebuttal.

During rebuttal the State called Eckerty who testified as follows:

"Q. [State's Attorney]: Now calling your attention to September 21, 1986, did you have occasion to, for the first time, interview Darrell Herrington?

A. [Eckerty]: Yes, sir.

Q. And who was present at that time?

A. Well, it would be Gene Ray and Jim Parrish of the Paris Police Department, myself, and yourself.

Q. It would be the State's Attorney?

A. Yes, sir.

Q. And in particular, how did Darrell Herrington describe the position of mattress?

A. He described—

Mr. Muller [Defense Counsel]: I object, your Honor. That's hearsay. He can put Darrell on the stand if he wants to.

THE COURT: Overruled.

Q. How did he describe the position of the mattress?

A. He described the mattress lying east and west.

Q. Now at the time what was your recollection as to the position of the mattress?

A. At that time we were thinking of the original crime scene, and thinking that the mattress was laying north and south.

Q. And was Darell Herrington shown any photographs at all in September of '86?

A. No, he was not.

Q. And what was your reaction regarding Darrell Herrington's statement in regards to the position of the mattress?

A. I thought Darrell was wrong on the position of the mattress.

Q. And at what point did you change your mind?

A. Well, there was a—Well, it was a couple of days later when we were looking at the reconstruction photos, and at that time we realized that Darrell Herrington was right, that the mattress was lying east and west.

Q. Ad [*sic*] he described it initially?

A. Yes, sir."

As the proceedings at trial show, the defendant objected to Eckerty's description on the grounds of hearsay and not on the grounds of improper rebuttal. This failure to object to the evidence on the grounds of improper rebuttal waives that issue on appeal. (*People v. Canaday* (1971), 49 Ill. 2d 416, 423-24.) Although defendant did object to Eckerty's testimony as hearsay at the time of trial, he did not raise the issue in his post-trial motion for a new trial. Therefore, the issue is waived. *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

Defendant next contends that he was denied a fair trial and due process by the prosecutor's remarks during closing argument that: (1) referred to hearsay testimony the trial judge had previously excluded; (2) misrepresented the testimony of various witnesses; (3) misstated defendant's testimony; and (4) made unfounded conclusions from the evidence. Defendant did not object to any of the statements during trial and he did not raise objections to the remarks in his post-trial motion for a new trial.

Defendant, by his failure to object to these comments at trial, waived on appeal any alleged errors concerning the prosecutor's comments during closing arguments. (*People v. Odle* (1988), 128 Ill. 2d 111, 134-35.) He has further waived his objections by failing to raise them in his post-trial motion. *Odle*, 128 Ill. 2d at 134-35; *Enoch*, 122 Ill. 2d at 186.

Defendant next asserts that he was denied a fair trial and due process by the trial court's failure to give his tendered instruction that the testimony of a drug addict should be viewed cautiously. During the instructions conference, defense counsel tendered the following instructions:

"An addict who testifies for the prosecution is a witness of questionable reliability, because of fear of prosecution and of being deprived of substances he or she craves."

"The testimony of an addict is to be scrutinized with great caution and if the jury was to find that a witness was an addict or used drugs at about the time of the alleged crime, such finding would be an important factor to the general reliability of the addict."

The trial judge refused to offer defendant's tendered instructions, and defendant contends that these instructions were essential because Deborah Rienbolt, a crucial witness for the State, admitted she was a drug addict and had ingested drugs in July of 1986, when the murders occurred. The trial court did, however, offer IPI Criminal 2d No. 1.02, which informs the jury that it is the sole judge of the believability of the witnesses and of the weight to be given to their testimony.

This court has held that it is not reversible error to deny a tendered addict instruction, where evidence of the addiction is before the jury so that it can make its own determination of the believability of the witness. (*People v. Adams* (1985), 109 Ill. 2d 102, 122-23.) Furthermore, recent decisions have held that it is not error to refuse to give a tendered addict instruction. (See, *e.g., People v. Huffman* (1988), 177 Ill. App. 3d 713, 727-28; *People v. West* (1987), 156 Ill. App. 3d 608, 612; *People v. Rollins* (1982), 108 Ill. App. 3d 480, 488.) "Jurors do not leave their common sense behind when they enter court, and even in the absence of cautionary instructions they will ordinarily be aware of the factors which make some witnesses unreliable." *Rollins*, 108 Ill. App. 3d at 488.

In the present case, Rienbolt's drug addiction was revealed on direct examination. The defendant was given wide latitude in his cross-examination of Rienbolt con-

cerning her drug addiction. A review of the record indicates that Rienbolt's drug addiction was thoroughly discussed at trial. As the jury was fully apprised of Rienbolt's addiction, and because IPI Criminal 2d No. 1.02 was given, the trial judge did not abuse his discretion in denying defendant's tendered jury instruction.

Defendant additionally contends that his right to effective assistance of counsel was denied when his trial counsel: (1) failed to object to Debra Steidl's testimony as to the two conversations she had with defendant after the murders where she accused him of killing the victims, as it was irrelevant, inadmissible, and prejudicial; (2) failed to object when the trial court refused to supply testimonial transcripts to the jury; (3) failed to object to the prosecutor's comments during closing argument; and (4) failed to use prior statements of Deborah Rienbolt for impeachment purposes.

In *People v. Albanese* (1984), 104 Ill. 2d 504, this court followed *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, where a two-part test for ineffective assistance of counsel was announced: (1) defense counsel's representation of defendant must have fallen below an objective standard of reasonableness; and (2) the counsel's shortcomings must be so serious as to deprive defendant of a fair, reliable trial. (*Albanese*, 104 Ill. 2d at 525, quoting *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) In *Albanese* this court also noted:

> "To assist lower courts, the Supreme Court also offered the following guidelines for applying its two component standard: '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prej-

udice, which we expect will often be so, that course should be followed.' [*Strickland*] 466 U.S. [668, 697], 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2069-70." (*Albanese*, 104 Ill. 2d at 527.)

"As to the first element of the standard, there is a strong presumption that the challenged action of counsel was the product of sound trial strategy and not of incompetence." *People v. Barrow* (1989), 133 Ill. 2d 226, 247.

Defendant's ex-wife, Debra, testified that approximately one month after the murders she spoke with defendant on the phone. During the conversation, she said "You killed those people didn't you" and defendant hung up. She also said that she saw defendant in a tavern several days later and again accused him of killing Dyke and Karen Rhoads. In an angered reply, defendant kicked a chair and said "You're next."

Defendant argues that the testimony was inadmissible under *People v. Schulz* (1987), 154 Ill. App. 3d 358, and that counsel was ineffective in failing to object to its admission. In *Schulz*, a witness testified that the defendant, charged with murder, said after the incident that he was glad that his girlfriend (the decedent) was gone, because he was in love with another woman. (*Schulz*, 154 Ill. App. 3d at 371.) The court ruled that the statement was irrelevant and inadmissible hearsay. However, in *People v. Allen* (1983), 119 Ill. App. 3d 186, the appellate court upheld the relevance of a witness' accusation against an accused, to which the accused arguably assented. The court noted that "[s]uch an assent may be manifested by silence [citation] or by an evasive, equivocal, or unresponsive reply." *Allen*, 119 Ill. App. 3d at 194.

The decision whether or not to object to testimony is generally a matter of sound trial strategy (see, *e.g.*, *People v. Shum* (1987), 117 Ill. 2d 317, 372 (failure to object

to impermissible opening and closing arguments represented tactical trial decision)), which is entitled to great deference on review (*People v. Harris* (1989), 129 Ill. 2d 123, 156). Defendant's trial counsel's decision not to object to Debra's testimony, especially in light of the conflicting appellate decisions on the issue, must be presumed to be a product of sound trial strategy and not of incompetence (*Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2065). Furthermore, the defendant was not prejudiced by the remark, even if counsel's failure to object was error.

Defendant's ineffective-assistance-of-counsel claim also fails with respect to his claims relating to his trial counsel's failure to object to the trial court's refusal of the jury's request for transcripts, and to remarks in the prosecutor's closing argument. Earlier in this opinion, we noted that defendant was not denied a fair trial because of either of these claims. "To prevail on a claim alleging ineffective assistance of counsel, a defendant must establish that he was prejudiced as a result of counsel's errors." (*People v. Jimerson* (1989), 127 Ill. 2d 12, 34.) As was noted earlier in this opinion, on the record, neither the trial judge's failure to give the jury the transcripts nor the remarks in the prosecutor's closing argument prejudiced the defendant or undermined this court's confidence in the outcome of the trial.

Defendant cites to three pretrial statements Deborah Rienbolt made that he argues exonerate or exculpate him. He argues that his counsel was ineffective because he failed to use these statements. There are really only two statements, as one is an affidavit referring to one of the earlier statements. The affidavit was used by the police to obtain a court-ordered wiretap which was used in co-defendant Whitlock's trial, and is thus quite brief. (See *People v. Whitlock* (1988), 174 Ill. App. 3d 749,

779.) This statement clearly did not exculpate the defendant, and thus it was not ineffective assistance of the trial counsel not to use the affidavit.

The other pretrial statements Rienbolt made do not specifically name the defendant as the killer. However, the statements do place the defendant in the company of Whitlock and Herrington, and in the presence of Rienbolt, on the night of the murders. These statements, also, do not exculpate or exonerate the defendant. As was observed in *Jimerson*, there can be legitimate reasons for counsel's not using prior inconsistent statements of a witness. (*Jimerson*, 127 Ill. 2d at 34.) The court also noted that strategic choices are virtually unchallengeable and the "value of the potentially impeaching material must be placed in perspective." (*Jimerson*, 127 Ill. 2d at 33.) A review of the record shows that defense counsel did cross-examine Rienbolt as to her various drug dependencies and possible reasons for bias, as well as inconsistencies in her testimony. He also referred to some of her pretrial statements, but it appears that counsel was carefully avoiding the possibility that the prosecutor could use Rienbolt's prior statements to show consistencies in her testimony. However, even if it were error, this court is unable to conclude that, on this record, defendant was prejudiced as a result.

## SENTENCING

Defendant next asserts that he was denied a fair sentencing hearing because prospective juror Mary Dalide was excluded, for cause. Defendant's argument is based on the following colloquy between the court and prospective juror Dalide:

"THE COURT: Ms. Dalide will your attitudes towards the death penalty make it impossible to follow the instructions of law which the court may give you regarding the death penalty?

MS. DALIDE: Might.

THE COURT: Okay. Are your feelings about the death penalty such, Ms. Dalide, that regardless of the evidence presented you could not vote to impose the death penalty under any circumstances?

MS. DALIDE: Under any circumstances, I don't know under any circumstances, but I have—

THE COURT: Strong reservations?

MS. DALIDE: I do. I really do."

After a few more questions, The State asked that Dalide be excused for cause and, without objection from the defendant, the trial court excused Dalide for cause.

The State argues that defendant's failure to object to the trial court's ruling waives the issue on appeal, and that, on the merits, this court should accept the findings of the trial court, as Dalide's remarks could be described as ambiguous and the trial court was in a superior position to determine the meaning of her responses.

As the court noted in *People v. Gacho* (1988), 122 Ill. 2d 221, 239:

> "*Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, prohibits the exclusion for cause of prospective jurors who express only general objections to the death penalty. In *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, the Court held that a juror may not be excused unless his or her views ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' "

The court also noted that the failure to object to an issue is a procedural default. (*Gacho*, 122 Ill. 2d at 239.) Defendant argues that this court should review this issue under the plain error doctrine (107 Ill. 2d R. 615(a)) despite his admitted failure to properly preserve the issue for appeal. The plain error exception is only available in those limited cases where the error affects a substantial right. *Gacho*, 122 Ill. 2d at 239.

Even if defendant had properly preserved this issue for review, the record shows a proper basis for the exclusion of prospective juror Dalide under *Witherspoon* and *Wainwright*. In *Gacho*, the prospective juror was asked if she could impose the death penalty under any circumstances and responded, "No, I would rather not." This court held that the answer indicated that the prospective juror's responses "demonstrate that her views concerning the death penalty would prevent or substantially impair the performance of her duties as a juror in accordance with the instructions and her oath." *Gacho*, 122 Ill. 2d at 238-40; see also *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 431.

Although Dalide's responses to the questions concerning the death penalty were arguably ambiguous, they were not any more ambiguous than the answers prospective jurors gave in *Gacho* and other cases where this court held that prospective jurors were properly dismissed for cause. As the trial court was in a much better position to determine what Dalide's ambiguous remarks meant, the trial court did not err in excusing prospective juror Dalide for cause.

Defendant next contends that he was denied a fair sentencing hearing because the trial court failed to give his proposed jury instruction (applicable to one convicted of multiple murders):

"If you do not find the death penalty appropriate, the defendant will be sentenced by the court to a sentence of natural life without parole."

In arguing that the tendered instruction should have been given, defendant relies on *People v. Gacho* (1988), 122 Ill. 2d 221, where the court held that:

"[a]n instruction in the case of multiple murders should state that if the jury finds mitigating factors sufficient to preclude imposition of the death penalty, the defendant will be sentenced to natural life imprisonment, and no

person serving a term of natural life imprisonment can be paroled or released, except through executive clemency." (122 Ill. 2d at 262.)

In *Gacho*, the court held that this rule would be applicable in a prospective manner only. (*Gacho*, 122 Ill. 2d at 263.) As the defendant's sentencing hearing took place prior to the *Gacho* decision (in 1987), the trial court properly instructed the jury as to the relevant law.

Defendant argues that in light of *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, the new rule announced in *Gacho* must be applied retroactively. According to *Griffith*, decisions announcing new constitutional rules of criminal procedure are "to be applied retroactively to all cases, state or federal, pending on direct review or not yet final." (479 U.S. at 328, 93 L. Ed. 2d at 661, 107 S. Ct. at 716.) The court has answered defendant's argument in other cases, and has held that the *Gacho* rule was decided as a proper rule of statutory interpretation, and did not constitute a new constitutional right. (See, *e.g., People v. Franklin* (1990), 135 Ill. 2d 78, 114; *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 288; *People v. Coleman* (1989), 129 Ill. 2d 321, 348-49; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 43-44.) We reaffirm the view that the *Gacho* rule is prospective only.

Defendant next argues that his death sentence should be vacated and a sentence of natural life imprisonment be imposed because of a heightened reliability requirement for death sentences. This court has held that where no reasonable doubt of guilt exists, where no reviewable error has occurred, and where there is no indication that the jury has imposed the death sentence in an arbitrary, capricious, or uneven manner, reversal of the death sentence is neither required nor permitted. See, *e.g., People v. Perez* (1985), 108 Ill. 2d 70, 94; *People v. Free* (1983), 94 Ill. 2d 378, 430.

As has already been stated, no reversible error occurred at trial, and there is no reason to believe that the death penalty was imposed in an arbitrary, capricious or uneven manner. Earlier in this opinion, we noted that there was enough evidence to find the defendant guilty beyond a reasonable doubt, and the death penalty will not be overturned on this ground.

The defendant also argues that his death sentence is disproportionate to the natural life imprisonment given to his co-defendant, Whitlock. In reviewing sentencing, this court will accord great deference to a trial judge's decision, so long as there is no arbitrary and capricious disparity between co-defendants. (*People v. Ashford* (1988), 121 Ill. 2d 55, 88.) In light of the fact that co-defendant Whitlock was found guilty of a single murder (see *People v. Whitlock* (1988), 174 Ill. App. 3d 749), while defendant was found guilty of two murders, the sentencing disparity was not arbitrary and capricious, and is a valid cause of the difference in sentences. Furthermore, the evidence adduced at trial shows that defendant was a full and willing participant in the events that led to his double-murder conviction.

Defendant further maintains that the death penalty is excessive in his case. This court has noted:

"Determining whether a death sentence is proper in a particular case 'requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.' [Citations.] A sentence does not offend the proportionality requirement if it is commensurate with the seriousness of the crimes and gives adequate consideration to any relevant mitigating circumstances ***." *People v. Perez* (1985), 108 Ill. 2d 70, 93.

Defendant has had no previous felony convictions, but he has had seven prior misdemeanor convictions, includ-

ing four for crimes of violence. Evidence at trial also showed that defendant was actively involved in illegal drug transactions. Furthermore, the violent and heinous nature of the murders shows a disregard for human life. Therefore, we do not believe that the death penalty is excessive.

Defendant also contends that it was a violation of his constitutional rights to instruct the jury, during the sentencing phase of the trial, that "[n]either sympathy nor prejudice should influence you." (IPI Criminal 2d No. 1.01(5).) The court has repeatedly held that this is a proper instruction. (See, *e.g., People v. Franklin* (1990), 135 Ill. 2d 78, 112-13; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 43; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445.) As defendant raises no new argument as to why the instruction is inappropriate, and as this court's prior decisions on the point are persuasive, we find the instruction appropriate.

Finally, in regards to his sentencing hearing, defendant argues that he was denied effective assistance of counsel. Defendant, initially, argues that the failure of defense counsel to present any mitigating evidence is *per se* ineffective assistance. He alternatively argues that, even if the failure to offer mitigating evidence is not considered to be *per se* ineffective assistance, defense counsel's failure to offer mitigating evidence combined with his perfunctory closing argument does amount to ineffective assistance of counsel.

The standard for assessing the effectiveness of defense counsel's performance during trial was set out in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. Accordingly, the standard for a death sentence proceeding "is sufficiently like a trial in its adversarial format and in the existence of standards for decision [citation], that counsel's role in the proceeding is comparable to counsel's role at trial."

(*Strickland*, 466 U.S. at 686-87, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.)

> "The defendant must show: (1) that his counsel's performance was so deficient as to fall below an objective standard of reasonableness under 'prevailing professional norms'; and (2) that the deficient performance so prejudiced the defense as to deny the defendant a fair trial. [Citation.] To establish the deficiency of counsel's performance, the defendant must overcome the 'strong presumption' that his counsel's representation fell within the 'wide range of reasonable professional assistance.' [Citation.] As such, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.' " (*People v. Franklin* (1990), 135 Ill. 2d 78, 116-17, quoting *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.)

This court has held that the failure to offer evidence in mitigation at a death penalty hearing will not, in and of itself, be sufficient to demonstrate that a defense attorney was ineffective. *People v. Orange* (1988), 121 Ill. 2d 364, 389; *People v. Shum* (1987), 117 Ill. 2d 317, 370.

*Strickland* is a particularly important precedent for this case because the facts of the underlying case concerned an attorney who failed to present any mitigating evidence at the sentencing phase of a capital prosecution. (*Strickland v. Washington*, 466 U.S. at 698, 80 L. Ed. 2d at 700, 104 S. Ct. at 2070.) The Court found that, based upon application of the two-part test for ineffectiveness developed therein, the defendant's counsel was not ineffective. Similarly, in *Burger v. Kemp* (1987), 483 U.S. 776, 97 L. Ed. 2d 638, 107 S. Ct. 3114, the Court, noting that a great amount of deference to trial counsel was necessary, found that the trial attorney's decision to present no evidence in mitigation was competent, when viewed in terms of counsel's overall trial strategy.

In the case at bar, the defendant urges that the court adopt a *per se* rule that a trial counsel's failure to offer mitigating evidence is ineffective assistance of counsel. This court finds that such a rule is contrary to the dictate of the United States Supreme Court that trial counsel may make a strategic decision not to present mitigating evidence. (See, *e.g., Burger v. Kemp* (1987), 483 U.S. 776, 97 L. Ed. 2d 638, 107 S. Ct. 3114.) Mitigating evidence can be double-edged, and trial counsel may feel that the risks in presenting potentially mitigating evidence are too high. Under *Strickland* and *Burger*, this court should defer to the trial counsel's decision unless there is proof that he failed to present mitigating evidence due to his failure to properly investigate and prepare the defense. To argue in this case that defense counsel knew that mitigating evidence existed and failed to investigate further, or did not investigate into potentially mitigating evidence at all, requires unsubstantiated speculation. Given the record in this case, this court can only presume that defense counsel made a strategic choice not to present any evidence in mitigation.

We additionally find that defense counsel's closing statement does not amount to ineffective assistance of counsel. Although his closing argument was brief, defense counsel did argue that defendant's prior criminal history (the only evidence the State offered in aggravation) did not justify the imposition of the death penalty, as the prior convictions were misdemeanors and defendant was much younger when the offenses took place. Furthermore, while defense counsel may have misstated the law (and this court certainly does not condone that), any misstatements he made were in the defendant's favor. Rather than arguing that in order to impose the death penalty the jury had to unanimously find no mitigating factors sufficient to preclude imposition of the death sentence, defense counsel argued that the jury had

to unanimously find that none of the mitigating factors occurred. We find that counsel's error clearly did not prejudice defendant because, if the jurors followed defense counsel's argument, *if any one juror* believed that *any one mitigating factor* existed, then the death penalty could not have been imposed.

## POST-JUDGMENT PETITION

Prior to oral argument in defendant's direct appeal of his conviction and death sentence, defendant filed with the circuit court a post-judgment petition pursuant to section 2—1401 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401). At the hearing on the petition, the following additional evidence was presented.

Subsequent to defendant's trial, appellate defense attorney Peter Rotskoff and witness Deborah Rienbolt spoke on the phone and met personally a number of times. These conversations were initially at the request of Rotskoff, but some of the later conversations were initiated by Rienbolt. On January 4, 1989, at the Peoria Correctional Center, Rienbolt and Rotskoff met and, Rotskoff testified, Rienbolt told him that defendant did not stab either Dyke or Karen Rhoads. She also told him that: (1) defendant was not at the crime scene at the time of the murders, although he may have been there at some point; (2) a man named James Slifer was present, and that a woman named Cheryl Costa had involvement in the murders; (3) someone at the courthouse was involved in the murders; and (4) "none" of her prior statements were "close to the truth."

After Rienbolt was transferred to the Dwight Correctional Center, Rotskoff and she had further correspondence. Rotskoff met her on January 13, 1989, and Rienbolt signed an affidavit stating that defendant did not stab Dyke or Karen Rhoads and that she had told this to the authorities prior to defendant's trial. She also stated

that only Herbert Whitlock stabbed Dyke and Karen Rhoads, and that he was the only one who came to her house and returned the knife on the morning following the crime. Phone records submitted at the hearing indicated that Rienbolt had initiated some of the above correspondence with Rotskoff.

At the post-trial proceeding, Rienbolt denied all the statements she made to Rotskoff, and further testified that she did not look at the affidavit prior to signing it. Beatrice Stanley, a notary public, testified that Rienbolt signed the affidavit a second time in front of her (it had already been signed when Stanley got to the room), and that Rienbolt did not object, or appear nervous or threatened when she signed the affidavit. Stanley also said that Rotskoff was the only other person there and that he seemed friendly.

A number of witnesses testified that they had previous conversations with Rienbolt after defendant's trial and that she had made statements such as: "many were involved and there was more to it"; and "I told them Randy [defendant] didn't do it, that Herbert Whitlock was the one that did it." Additionally, Rienbolt testified that she told the State's Attorney that she would not testify at defendant's trial unless she received a time credit. However, she also said that she made that threat to the State's Attorney for "leverage" in her own case, but that she intended on testifying against defendant and Whitlock all along. When Rienbolt was sentenced (after defendant's original trial), she was given a time credit, without objection from the State's Attorney.

Defendant submitted a written statement made on November 28, 1988, by Darrell Herrington, and alleged that he committed perjury at the original trial when he implicated defendant in the murders. He additionally alleged that Herrington's statement provides the basis for various aspects of police misconduct. The circumstances

of Herrington's statement are important. He met defendant's trial attorney, S. John Muller, and Rotskoff at Muller's office on November 28, 1988. According to Herrington's testimony at the hearing, he spoke with defendant's attorney for an hour and was offered assistance in regaining his driver's license. He said that the attorney also assured him that he did not need an attorney, and Herrington then made a reported statement.

Although video and audio tape equipment was available, the attorney had Herrington's statement taken by a court reporter. The statement is replete with off-the-record conversations and also leading questions. After she finished recording Herrington's statement, the court reporter refused to sign an affidavit saying that defendant's attorneys did not speak with Herrington during the off-the-record conversations. In the reported statement, Herrington had recanted some of his trial testimony.

At the section 2—1401 hearing, Herrington reaffirmed the truth of the testimony he gave at defendant's trial. He also said that at his November 28, 1988, statement, he began to give the attorneys answers that he thought they wanted to hear. Defendant then presented other witnesses, who described themselves as friends of defendant, to testify to remarks Herrington made that are consistent with his November 28 statement.

Defendant also alleged that Ferlin Lester Wells, who testified at defendant's original trial concerning conversations he had with defendant while the two were incarcerated at the Edgar County jail, lied at the original trial. Two other witnesses testified that when Wells went back to the prison after defendant's trial, he told them that he lied at defendant's trial. The two witnesses were shown to have questionable reputations for truth and veracity, although neither claimed to personally know, or be friendly with, the defendant.

Wells further testified that his testimony at the original trial was truthful. He said that he had hoped that his cooperation would be taken into consideration with his own pending charges, but that no offer of leniency or plea bargain was given him in exchange for his testimony. At the close of the hearing, the circuit court found that defendant failed to meet his burden under section 2—1401, that the testimony upon which his conviction was based was not clearly and convincingly false. Thus, he was not entitled to a new trial on the grounds that his original trial was based on false evidence.

In regards to the post-trial petition, defendant argues that, in light of the evidence presented at the hearing, the trial court abused its discretion in not ordering a new trial. The purpose of a section 2—1401 petition is to bring forth facts which, had they been known at the time of trial, would have prevented entry of the judgment. (*People v. Sanchez* (1989), 131 Ill. 2d 417, 419.) Furthermore, "[a]lthough the petition is usually characterized as a civil remedy, its remedial powers extend to criminal cases." (*Sanchez*, 131 Ill. 2d at 420.) The appropriate standard of review for the denial of a petition is whether the trial court abused its discretion. (*Sanchez*, 131 Ill. 2d at 420.) Defendant argues that since Rienbolt, Herrington, and Wells clearly committed perjury at the original trial, his section 2—1401 petition should have been granted. This court has noted that "Section 72 [the predecessor to section 2—1401] provides a basis for obtaining relief from a judgment based upon perjured testimony ***." *People v. Jennings* (1971), 48 Ill. 2d 295, 298.

Much of defendant's argument concerns Rienbolt's and Herrington's recantations of trial testimony. Rienbolt's recantation was made in an affidavit and Herrington's was made in a reported statement. In regards

to recantations this court has long held that they are inherently unreliable.

> "Recantation by a witness of his testimony on a trial does not necessarily entitle a defendant to a new trial. Recanting testimony is regarded as very unreliable, and a court will usually deny a new trial based on that ground where it is not satisfied that such testimony is true. Especially is this true where the recantation relied on involves a confession of perjury. The recanting testimony of witnesses will not ordinarily be regarded as sufficient ground for a new trial except in extraordinary and unusual cases. (33 A.L.R. p. 550, note.) The affidavit of a recanting witness is not entitled to so much weight as to justify the conclusion that the evidence given by him was corrupt and willfully false. The conclusion of the jury would rather warrant the presumption that his testimony was truthful and his affidavit false. Those experienced in the administration of criminal law well know the untrustworthy character of recanting testimony." *People v. Marquis* (1931), 344 Ill. 261, 265.

See also *People v. Bickham* (1974), 23 Ill. App. 3d 1074, 1078; *People v. Bushey* (1988), 170 Ill. App. 3d 285, 289.

In *People v. Ellison* (1980), 89 Ill. App. 3d 1, the defendant argued that a new trial was necessary due to a witness' having recanted her testimony. The victim/witness testified at the original trial that defendant had raped her. In a post-trial deposition, the victim said that the defendant, in fact, did not rape her. However, at the evidentiary hearing on the defendant's petition, the victim/witness testified that her original trial testimony was the correct statement of fact. After noting that recantations are inherently unreliable, that no representative of the State's Attorney's office was present at the victim/witness' deposition, and that the trial court was in the best position to determine what the truth was (as it could observe the witness' demeanor), the court held that there clearly was not an abuse of discretion in the

trial court's denying defendant's petition for a new trial. 89 Ill. App. 3d at 9.

All three of the witnesses that defendant alleges perjured themselves at his trial were present at his section 2—1401 hearing. All three of the witnesses stated that they testified truthfully at defendant's original trial. As has been noted, Rienbolt and Herrington made recantations of their trial testimony in sworn, post-trial statements. However, the conditions in which the recantations were made were less than ideal; thus the trial court had discretion to decide how much weight to give to the recanted testimony.

This court cannot say that the trial court abused its discretion in denying defendant's section 2—1401 petition. Witness Herrington's statements were all made as answers to leading questions, and the record was replete with off-the-record conversations. Notably, the court stenographer refused to sign an affidavit saying that defense attorneys did not speak with Herrington during the off-the-record conversations. Additionally, both Rienbolt's and Herrington's statements are suspect because neither witness was represented by counsel at the time and a representative of the State's Attorney's office was not present when the statements were made. Thus, the trial court clearly did not abuse its discretion in finding that there was no sufficient new evidence to justify a new trial.

Defendant also argues that even if the evidence of alleged recantations is not sufficient to entitle him to a new trial, the new evidence should at least entitle him to a new sentencing hearing. Defendant relies on a discussion in *Lockhart v. McCree* (1986), 476 U.S. 162, 181, 90 L. Ed. 2d 137, 153, 106 S. Ct. 1758, 1761, where the Court noted that, in a capital case, one of the benefits of having the same jury that determines guilt determine the penalty is that the jury may consider "resid-

ual" or "whimsical" doubt as to guilt in deciding whether or not to impose the death penalty. This reasoning has been criticized, as the Court has noted that the *Lockhart* opinion:

> "stands for *** the simple truism that *where* 'States are willing to go to allow defendants to capitalize on "residual doubts," ' such doubts will inure to the defendant's benefit. *Lockhart, supra,* at 181. *Lockhart* did not endorse capital sentencing schemes which permit such use of 'residual doubts,' let alone suggest that capital defendants have a *right* to demand jury consideration of 'residual doubts' in the sentencing phase." (Emphasis in original.) *Franklin v. Lynaugh* (1988), 487 U.S. 164, 173, 101 L. Ed. 2d 155, 165, 108 S. Ct. 2320, 2326-27.

Under the death penalty statute, evidence is admissible at the death sentence hearing that would not ordinarily be admissible during the guilt phase of the trial. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(e); *People v. Hall* (1986), 114 Ill. 2d 376, 416.) "The factors controlling the admissibility of evidence *** are relevance and reliability, and the determination of admissibility rests in the discretion of the trial court." (*Hall,* 114 Ill. 2d at 416-17.) As has already been noted, at the section 2—1401 hearing, the trial court did not find that the evidence of Rienbolt's and Herrington's recantations was reliable. Thus, we find that the trial court did not abuse its discretion in denying defendant a new sentencing hearing.

Defendant also contends that he is entitled to a new trial, or an evidentiary hearing, because prosecution witness Darrell Herrington was, several months prior to defendant's original trial, hypnotized to probe his knowledge of the Rhoadses' murders. Herrington had made statements to the police on September 21 and November 24, 1986 (one day prior to being hypnotized), regarding the Rhoadses' murders. At trial some of his testimony was similar to his September statement and some of his

testimony was similar to his November statement to the police.

In *People v. Zayas* (1989), 131 Ill. 2d 284, the court held that "[t]he proponent of prehypnotic recall *** will bear the burden of establishing that the testimony of the previously hypnotized witness is based solely upon that witness' independent, prehypnotic recall." (131 Ill. 2d at 297.) The court also noted that "a witness other than the defendant himself may not offer testimony to the extent that it is enhanced through hypnosis." *Zayas*, 131 Ill. 2d at 286.

Prior to the court's *Zayas* decision, the court decided *People v. Wilson* (1987), 116 Ill. 2d 29, where it held that the "the proponent of the [post-hypnotic] testimony should establish the nature and extent of the witness' prehypnotic recall." (116 Ill. 2d at 48-49.) In regards to Herrington's testimony, defendant did not contemporaneously object at trial, or object in his post-trial motion for a new trial. Therefore, defendant has waived the issue on appeal. *People v. Enoch* (1988), 122 Ill. 2d 176, 186.

## CONSTITUTIONALITY OF THE DEATH PENALTY

The defendant's final arguments are broad-based attacks on the constitutionality of the Illinois death penalty act (Ill. Rev. Stat. 1989, ch. 38, par. 9—1). Defendant offers no new reasons for this court to find the statute unconstitutional and only argues that this court should reexamine the earlier precedents. The court has recently reviewed the precedents upholding the constitutionality of the death penalty act. (See, *e.g., People v. Franklin* (1990), 135 Ill. 2d 78, 119-20; *People v. Jimerson* (1989), 127 Ill. 2d 12, 55.) There is no reason to further reexamine the court's precedents and defendant's invitation to do so is declined.

## CONCLUSION

For the reasons set forth above, we affirm the defendant's conviction and sentence of death. We also affirm the circuit court's denial of defendant's section 2—1401 petition for a new trial. The court hereby directs the clerk of this court to enter an order setting Tuesday, May 14, 1991, as the date on which the sentence of death entered by the circuit court for Edgar County shall be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a copy of the mandate to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where the defendant is confined.

*No. 65714—Affirmed.*
*No. 70320—Affirmed.*

JUSTICES BILANDIC, HEIPLE and FREEMAN took no part in the consideration or decision of this case.