HELEN C. JACOBSEN, Plaintiff-Appellee, *v.* NATIONAL BANK OF AUSTIN, Trustee, *et al.,* Defendants-Appellees.—(LEE N. ROMANO *et al.,* Counter-plaintiffs and Third-Party Plaintiffs-Appellants, *v.* NATIONAL BANK OF AUSTIN, Trustee, *et al.,* Counterdefendants-Appellees—(ROBERT CAREY, SR., Third-Party Defendant-Appellee).)

First District (3rd Division)    No. 62907

Opinion filed September 27, 1978.

456

Hamilton Smith and Joseph G. Scoville, both of McDermott, Will & Emery, of Chicago, for appellants.

Edward M. White and Louis A. Lehr, Jr., both of Arnstein, Gluck, Weitzenfeld & Minow, of Chicago, for appellees.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:
This cause was initiated on a (second amended) counterclaim and third-party complaint for reformation and rescission of contracts relating to real estate which arose from an action to foreclose a mortgage on a certain tract of land consisting of 20 acres held in Trust No. 3679 by the National Bank of Austin, as trustee. The foreclosure action has been settled and, therefore, it is no longer an issue among the parties. In a prior appeal this court held that the counterclaim and third-party complaint of Lee and Barbara Romano (husband and wife) stated a cause of action and remanded the matter for trial on the merits. In deciding the case, the court stated:

"The Romanos contend their allegations claiming they were persuaded by their attorney [Robert Carey, Sr.] to transfer substantial interests [in Trust No. 3679] to members of the attorney's family for inadequate consideration state a cause of action. The law in Illinois is well settled that when an attorney deals with his client, the burden of proof is on him to show fairness. (*Jennings v. McConnel* (1855), 17 Ill. 148; *Vrooman v. Hawbaker* (1944), 387 Ill. 428.) In *Vrooman*, the court said:

'Where this relation of attorney and client exists and the attorney receives anything of benefit thereby, either by purchase from the client or by acquiring interests contrary to the interests of his client, the burden of proof rests upon the attorney to show the fairness of the transaction, that it

was equitable and just, that it did not proceed from undue influence, and that the property so acquired does not belong constructively to the client.'

Also, see *Gromer v. Hahn* (1968), 97 Ill. App. 2d 276.

In the instant case the Romanos have alleged sufficient facts to place the burden on Carey to prove the fairness of the dealings." (*Jacobsen v. National Bank of Austin* (1972), 8 Ill. App. 3d 135, 139, 289 N.E.2d 253.)

The Romanos' allegations were fully stated in the court's prior opinion and will not be restated here. See 8 Ill. App. 3d 135, 136-39.

Trial was had in the Chancery Division of the Circuit Court of Cook County between April 14, 1975, and May 22, 1975. On July 31, 1975, the court issued its findings and entered judgment in favor of the counterdefendants and third-party defendant, and against the Romanos. The transcript of the proceedings before the trial court consists of 1290 pages, including 45 pages which report the court's findings and the colloquy which ensued therefrom. The Romanos appeal from the judgment entered in the trial court, seeking a reformation of the agreement which distributed the beneficial interests in Trust No. 3679 and the rescission of two subsequent agreements by which the Romanos transferred two additional 6 2/3% interests in the land trust to Jane Lyons Ford, Carey's sister-in-law, and to Carey himself.

The Romanos contend that the evidence fails to support the proposition that the transactions with Carey and the counterdefendants were fair. This contention is presented in terms of the lawyer's failure to carry the burden of proof as to fairness. In support of this position the Romanos point to three factors: (1) the documents evidencing the transactions do not reflect the entire agreements between Lee Romano and Carey; (2) the agreements were not supported by adequate consideration, and (3) the Romanos did not have independent legal advice prior to entering into the transactions and signing the documents.

■■ On the other hand, Carey and the counterdefendants contend that the judgment entered in the trial court was correct for the reasons given by the judge. In the alternative they seek to support the circuit court's judgment by asserting the defenses of release of claims, laches and ratification of contracts. Carey also seems to suggest that the lack of an attorney-client relationship with the Romanos concerning the acquisition of the 20 acres, the distribution of the interests in Trust No. 3679, and the transfer in 1965 of the two 6 2/3% interests in the land trust, somehow diminishes his responsibility concerning the proof of fairness of the dealings. This suggestion, however, is of no consequence, since a lawyer's burden of demonstrating fairness applies to all transactions between attorney and client, "and is not confined to particular property about

which the attorney may have been employed." (*Jennings v. McConnel* (1855) 17 Ill. 148, 150.) Carey and the Romanos maintained an attorney-client relationship with respect to other matters at the time that they entered into the transactions which gave rise to the present controversy. Furthermore, it is apparent from the record that the Circuit Court treated the cause as one involving transactions between an attorney and his clients. Under these circumstances, it is not necessary to determine the degree, if any, to which Carey represented the Romanos in the acquisition of the 20 acres.

Since the Romanos have contested the written terms of the transactions with Carey and the counterdefendants, it was necessary for the trial court to determine whether the documents evidencing the transactions actually reflected the intended agreements of the parties. In contradiction to the documents, the Romanos purported to show their entitlement to as much as an 80% interest in the land trust, and that the later transactions, involving the two 6 2/3% interests, were loans and not sales.

The report of proceedings for July 31, 1975, clearly reveals that the court determined the terms of the agreements by its findings as to the credibility of the witnesses. Concerning the agreement of November 13, 1962, by which the 20 acres were acquired by Trust No. 3679, and the beneficial interests therein were distributed, the court noted:

> "[I] would find on the basis of the evidence I heard and the witnesses I observed that the transaction was not as urged by Mr. Romano, a situation where he was promised one thing and then at the last minute was coerced into another transaction on the basis of undue influence or the improper use of the attorney-client relationship by Mr. Carey.
>
> I am persuaded from the evidence in this case that Mr. Romano was aware of the transaction, was aware of the November 13th agreement at the time he signed it and that it did not come as any shock or surprise to him and that when he executed it he knew what it was and he understood it, and I would find that to be a fact based on the evidence I heard."

In connection with the February 1965 and March 1965 transactions involving the 6 2/3% interests, the following observation of the trial court was recorded:

> "The evidence indicates that Romano went to Carey *seeking to sell* these things, that they discussed and negotiated a price and that Romano, a person who knew *precisely what he was dealing with,* accepted that price* * * ." (Emphasis added.)

Furthermore, the court indicated:

> "[B]ut I will say that Mr. Romano in the Court's opinion is one of the most unbelievable witnesses that I have ever listened to. I really am not sure precisely what I should say concerning him, but if I

ever saw a person to whom an agreement meant nothing it was Mr. Romano."

■■ The trial judge's finding as to the credibility of Lee Romano was amply supported by Mr. Romano's testimony concerning a series of encounters he had with a number of lawyers, politicians and public officials. Therefore, in view of the lack of evidence to corroborate the version of the transactions suggested by the appellants, the version evidenced by the documents was found to represent the agreements of the parties. Such a finding of fact will not be upset upon review, since the court, having heard and observed all the witnesses, is in a better position than we are to evaluate credibility and to weigh the evidence. *Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 247 N.E.2d 894, *cert. denied* (1969), 396 U.S. 961, 24 L. Ed. 2d 425, 90 S. Ct. 436.

We turn now to an evaluation of the fairness of the transactions as shown by the evidence, including the documents and the oral testimony. The transaction of November 13, 1962, reveals that the 20 acres, located near Chicago's O'Hare Airport, was the subject of a real estate sale contract under which Barbara Jean Romano had agreed to purchase the property, pursuant the exercise of an option, for the sum of $526,000. The testimony and documents of record indicate that Mrs. Romano had secured the option to purchase as the result of Lee Romano's long standing efforts to obtain the 20 acres for investment and development purposes. Mr. Romano had participated in other ventures for the acquisition of land, and had operated his own construction business in relation to the financing and development of these parcels. With regard to the purchase of the subject 20 acres, however, the Romanos' lack of funds necessitated the recruitment of outside investors.

Prior to the exercise of the option, Lee Romano approached his lawyer, Carey, and asked him to participate in the purchase of the property. Both parties agree that Carey, in return for his contribution, would have some percentage of ownership in the land, when and if the purchase was completed. Ultimately, negotiations between Romano and Carey were completed, and the 20 acres were bought by means of pooling the resources of Romano, Carey and other investors.

As earnest money, an initial contribution of $50,000 was provided by Olive Graham, a friend of the Romanos. In order to assure the extension of the option a loan of $200,000 was made to the sellers secured by a first mortgage on the property, and with the understanding the first mortgage would apply on the purchase price if the deal was closed. Carey and members of his law firm advanced this sum. In addition, the sellers agreed to payment of $88,000 within six months and an equal amount in 12 months with notes representing these obligations secured by a second mortgage. As a result of accelerated payment, however, the total indebtedness on these notes was eventually reduced to $160,000. The

460

balance of $100,000 was obtained from Joseph and Anna Abbate ($50,000), Jane Lyons Ford ($25,000), and Carey's children and law partners ($25,000).

Upon completion of the purchase, Barbara Romano caused title to the 20 acres to be conveyed to the National Bank of Austin, as trustee in Trust No. 3679. This transaction was handled by Carey's law firm. The trust agreement, also drawn by Carey's law firm and executed simultaneously with the conveyance, provided for the deposit of funds pledged toward the purchase price of the property and the allocation of beneficial interests in the land trust as follows:

| | | |
|---|---|---|
| Olive Graham | $50,000.00 | 6-2/3% |
| Lee N. Romano | $25,000.00 | 35% |
| Joseph S. Abbate and Anna L. Abbate, as joint tenants with the right of survivorship | $25,000.00 | 6-2/3% |
| Thomas F. Carey | $ 4,181.03 | 6-5/12% |
| Jane Lyons Ford | $25,000.00 | 3-1/3% |
| Helen Carey | $ 3,750.00 | 7-¼% |
| Robert Carey, Jr. | $ 3,750.00 | 7-¼% |
| Anthony Carey | $ 3,750.00 | 7-¼% |
| Jean O'Neill | $ 3,750.00 | 7-¼% |
| Judith Tharp | $ 3,750.00 | 7-¼% |
| Patrick S. Filter | $ 2,068.97 | 4% |
| Barclay Graham and Olive Graham, as Trustees for Thomas F. Carey | ****** | 1-21-3 |
| | $150,000.00 | 100% |

The trust agreement also provided:

"Each person contributing funds shall share in the proceeds in the percentage that his deposit bears to the entire sum deposited until each party has received the entire sum deposited by him without interest; thereafter the parties shall share in any additional proceeds according to their percentage of ownership in the Trust."

The trust agreement itself does not disclose the basis for calculation of the beneficial interests assigned, and it is obvious that the amounts of money contributed by the beneficiaries had little to do with the allocation of some of the interests. The record, however, discloses that this agreement was reached pursuant to negotiations between Romano and Carey. It seems that it was first understood that the two men would share equally in the deal and that a 10% interest would be assigned to Carey's law firm, in lieu of fees, for legal services performed in the acquisition and distribution of the 20 acres. This understanding was subject to the proviso that Carey would supply all of the purchase money for the deal. As it became clear that Carey would not be able to provide the entire sum necessary for the purchase of the property, the parties, still wishing to complete the deal, sought other contributors for the venture.

In return for a 6 2/3% interest in the trust, Romano received $50,000 each from Olive Graham and the Abbates. For another 6 2/3% interest in the trust, Carey procured $50,000 initially from Jane Lyons Ford; however, when Ford decided to reduce her investment to $25,000, the remaining $25,000 was invested by various members of Carey's family and law firm. This arrangement required that 20% of the beneficial interests be set aside for those who made the cash contributions. With 10% of the deal allocated to Carey's law firm, 70% was left to be divided equally between the original partners, Romano and Carey.

The total interest going personally to Carey, 35% plus a portion of the 10% share of the law firm, was divided and assigned to several of Carey's children. This resulted in the distribution of the interests as shown by the trust agreement. Romano still received his half of the 70%, but not in return for $25,000 as set forth in the agreement, which amount credited by the agreement to Romano was actually half of the $50,000 provided by the Abbates. Romano's 35% interest in the deal was for finding the property and nurturing the purchase.

It was the opinion of the trial judge that Romano should not be heard to complain of his receipt of a 35% share in a transaction involving several hundreds of thousands of dollars when he in fact contributed no money to the deal. The trial court refused to characterize the transaction as unfair. Romano had solicited the involvement of Carey and knowingly agreed to the ultimate distribution of the interests in the property pursuant to the terms of the trust agreement. Moreover, to characterize the interests taken

by Carey and assigned to Carey's children as unsupported by adequate consideration would belie the fact that all but $100,000 of the purchase price originated through Carey's efforts and came from members of his family and law firm.

■■ While the burden of establishing the fairness of the deal fell on Carey, this does not mean that evidence of fairness be found solely in his presentation of the case. Ultimately, the burden is satisfied if the record as a whole supports the trial court's finding that the transaction was fair. Here fairness was established by the combination of Romano's incredibility and the proof supplied by the documentary evidence as well as Carey's explanation of the deal. Once the trial court refused to accept the version of the 1962 transaction alleged by the Romanos, the amount of evidence which was necessary to establish fairness diminished. Accepting the facts evidenced by the documents and Carey's accounting, the court was entitled to conclude that the 1962 agreement was fair, both in terms of Lee Romano's share and the consideration arranged and given by Carey and his associates.

■■ Romano has also argued that Carey's burden of establishing the fairness of the 1962 transaction failed as a matter of law because the Romanos acted without independent legal advice. In support of this contention, the Romanos referred to the cases which made a showing of independent counsel an element to be considered in determining whether a transaction between an attorney and client is fair. (See, e.g., *McFail v. Braden* (1960), 19 Ill. 2d 108, 166 N.E.2d 46.) No case, however, has required a finding of independent counsel as a prerequisite to a finding of fairness. Indeed, the case of *Zeigler v. Illinois Trust & Savings Bank* (1910), 245 Ill. 180, 91 N.E. 1041, indicates a finding that the client had "competent and disinterested advice" or "entered into the transaction voluntarily, deliberately and advisedly, knowing it's nature and effect, and that his consent was not obtained by reason of the power and influence to which the relation might be supposed to give rise" is sufficient to hold a transaction between a fiduciary and his client fair. Moreover, in *Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 247 N.E.2d 894, *cert. denied* (1969), 396 U.S. 961, 24 L. Ed. 2d 425, 90 S. Ct. 436, the supreme court noted:

> "We are aware of no rule of law which deems the transfer fraudulent whenever there has been no private consultation with an independent adviser. Whether the settlor had independent legal advice is merely one of several factors which may be important in determining the fairness of a transfer." (42 Ill. 2d 365, 369.)

While *Brown* considered a transaction involving a trustee-settlor relationship, the same fiduciary obligations would be applicable to the attorney-client relationship; consequently, we find no reason to announce

a special rule for the instant case. The trial judge committed no error in failing to require a showing of independent counsel as part of Carey's burden of establishing fairness.

As previously noted, the trial court found that the transactions of February 12, 1965, and March 8, 1965, were sales, and not loans secured by Romano's assignment of the two 6 2/3% interests in the land trust. The trial court further found that these 1965 transactions were fair.

The evidence indicates that each of the 1965 assignments was made in consideration of $20,000. The assignment of February 12 purports to have been made to Jane Lyons Ford; however, when she elected to forego the deal, Carey advanced the required funds on behalf of his children. The interest, therefore, was assigned to the children. The transaction of March 8 involved Carey as the assignee in his own right. In both cases Carey negotiated the terms, drafted the documents and secured the necessary funds.

The trial court's decision that these transactions were fair was the result of his evaluation of the evidence as to the value of the 6 2/3% interests at the time of the assignments in February and March 1965. There was a great disparity between the various opinions given as to the net value of these interests. Carey testified that the land had increased in value 30%—50% or even 100% from 1962 to February and March 1965. He also testified that the value of the land in 1965 was between $900,000 and $1,000,000. No appraisal of the land was made in February or March 1965. In arriving at the value of the 6 2/3% interests Carey deducted the mortgages of $360,000 and pursuant to the terms of the agreement the cash equities of $150,000. On the basis of these factors, he figures that in 1965 the value of a 6 2/3% interest would be $20,000 and the total value of the entire parcel of land would be $810,000. The Romanos' expert witness testified that the fair market value of each 6 2/3% interest was $73,000 based upon a total valuation of the land at $1,800,000. Before computing the value of the 6 2/3% interest, he deducted the mortgages and the cash equities and then discounted the value by 15% for a minority interest. The expert witness for the counterdefendants and Carey valued the interests at $11,300 based upon a total valuation of the land at $850,000. He also deducted the mortgages and the cash equities before computing the value of the 6 2/3% interest. He discounted the resultant figure by 50% considering that it was a minority interest.

■■■ We concur in the findings of the trial court that the transactions of February 12 and March 8, 1965, were sales and not loans and that the transactions were fair. Considering all of the testimony, it is our opinion that these findings were not contrary to the manifest weight of the evidence.

Therefore, for the foregoing reasons, the judgment order of the Circuit

Court of Cook County denying the reformation of the trust agreement of November 13, 1962, and denying the rescission of the agreements of February 12, 1965, and March 8, 1965, is affirmed.

Affirmed.

McNAMARA and SIMON, JJ., concur.