2022 IL App (4th) 210679

NO. 4-21-0679

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 18, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* M.G., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Adams County |
|       Petitioner-Appellee, | ) | No. 21JD19 |
|       v. | ) | |
| M.G., | ) | |
|       Respondent-Appellant). | ) | Honorable |
| | ) | John C. Wooleyhan, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice DeArmond concurred in the judgment and opinion.
Presiding Justice Knecht dissented with opinion.

**OPINION**

¶ 1      After being found guilty of unlawful possession with intent to deliver cannabis and unlawful consumption of alcoholic liquor, respondent, M.G., was adjudicated a delinquent minor and sentenced to conditional discharge. Respondent appeals from the judgment adjudicating him a delinquent minor, arguing (1) the trial court committed plain error when it failed to *sua sponte* appoint a guardian *ad litem* (GAL) or, alternatively, his trial counsel provided ineffective assistance by failing to move for the appointment of a GAL; (2) his trial counsel provided ineffective assistance by failing to move to suppress evidence seized incident to his arrest; and (3) the State failed to present sufficient evidence to establish his intent to deliver the cannabis found in his possession. We affirm.

¶ 2                     I. BACKGROUND

¶ 3                                  A. The Delinquency Petition

¶ 4             On June 23, 2021, the State filed a petition alleging respondent was a delinquent minor in that he committed the following offenses earlier that same day: (1) possession of a stolen vehicle (625 ILCS 5/4-103(a)(1) (West 2020) (count I)); (2) possession with intent to deliver cannabis (720 ILCS 550/5(d) (West 2020) (count II)); and (3) consumption of alcoholic liquor (235 ILCS 5/6-20(e) (West 2020) (count III)). The petition alleged that respondent's date of birth was July 11, 2003, making him 17 years old at the time of the offenses. The petition also alleged that respondent's mother and father resided together at an address in Minnesota.

¶ 5                                  B. The Detention Hearing

¶ 6             Also on June 23, 2021, the trial court appointed counsel to represent respondent, who was in custody, and the court then conducted a detention hearing. The State presented a police report and testimony from a juvenile probation officer. Respondent did not present any evidence.

¶ 7             Jessica Brannan testified that she was a juvenile probation officer in Adams County. Brannan stated that she attempted to speak with respondent before the hearing but he gave her "very vague information." According to Brannan, respondent did report to her that "he had not been home in Minnesota for approximately a week." Brannan stated that respondent had been reported as a runaway in Minnesota and that he "had an Order of Protection against his mother." Brannan had been unable to contact respondent's mother or father. She had been in contact with someone from the "Interstate Compact" (a cooperative action among states to assist in the supervision or return of juveniles who have absconded) and was waiting to hear back regarding how Minnesota wanted to proceed. Until that time, she opined, respondent met the criteria for detention.

¶ 8             Respondent's counsel argued that respondent should be released because he had no

prior record. However, counsel acknowledged that the order of protection could mean respondent would have no place to stay. Counsel asked that if the trial court detained respondent, it conduct another hearing in five to seven days to readdress the issue. Counsel represented that he was "going to investigate to see if there might be some viable placement for the young man and see how the issue of the Minnesota missing persons report resolves itself."

¶ 9 The trial court found probable cause to believe respondent was a delinquent minor and it was a matter of immediate and urgent necessity that he be detained. The court continued the matter for further appearance to July 2, 2021. In its written order, the court directed summons to issue to respondent's parents.

¶ 10 C. Summons

¶ 11 On June 24, 2021, the State prepared and mailed summons to respondent's parents at their Minnesota address, advising them (1) a petition had been filed in this matter and (2) they were required to appear and answer the petition on July 2, 2021.

¶ 12 D. Appearance

¶ 13 On July 2, 2021, respondent appeared before the trial court with counsel. Respondent's parents did not appear. Respondent's counsel informed the court as follows:

> "[I have been] in conversation with another jurisdiction regarding this young man. I, quite frankly, have a number of questions I'm trying to sort out right now. I respectfully ask for one week to come back on Friday the 9th. I hope to have some more direction by that point."

The court continued the matter for further appearance to July 9, 2021.

¶ 14 E. Receipts of Service

¶ 15 On July 6, 2021, certified mail receipts were filed in the trial court. The receipts

showed that respondent's father received the summons on July 3, 2021. (We note the summons directed respondent's parents to appear on July 2, 2021.) Neither of respondent's parents ever appeared at any of the subsequent proceedings.

¶ 16                                    F. The Adjudicatory Hearing

¶ 17          On September 10, 2021, the trial court conducted an adjudicatory hearing. Respondent appeared with counsel. Respondent's parents did not appear. The State proceeded only on counts II and III of its petition. The State presented the following evidence.

¶ 18          Around 4 a.m. on June 23, 2021, Adams County Sheriff's Deputy Dakota Downs was on patrol in Quincy, Illinois, when he observed a truck in an Applebee's parking lot "with the hazard lights going with some front[-]end damage." Downs "ran the plate" on the truck and then approached it and found it was locked. Downs observed, "There was some [suspected] cannabis, [a] blunt. There were tips of them laying in the dashboard of the truck." After brief conversations with two separate civilians who waved him down, Downs searched the area for "a person related to [the truck]."

¶ 19          Downs located respondent "in timber" east of the truck's location. Respondent was taken into custody and searched. Respondent had a key hanging around his neck. Downs determined the key belonged to the truck. Respondent was also carrying a backpack. In the backpack, Downs found a half-full bottle of alcohol and "[a]pproximately" 22 factory-sealed packages of suspected cannabis. The packages had various names, such as "Sorbet," "Gary Payton," "Pink Rozay," and "Jokes Up." Downs secured the packages and later submitted them for laboratory testing. At some point, Downs located "a Liberian passport" belonging to respondent.

¶ 20          Downs attempted to speak with respondent while he was "in the back of the cop

- 4 -

car." When doing so, Downs smelled the "odor of alcohol coming from [respondent's] breath." Respondent did not provide Downs with any information, not even his name.

¶ 21    Downs acknowledged he did not recover any large sums of money from respondent's person and could not recall if he recovered any money from the truck. He did not believe that he recovered a cell phone from the truck.

¶ 22    A crime scene technician certified in marijuana identification by the Illinois State Police crime lab testified that she opened a selection of the 22 packages for analysis. She determined the opened packages contained 31.85 grams of cannabis. The analyst did not open and test further packages after she confirmed 31.85 grams of cannabis. She testified that the unopened packages that she did not test had the same factory or commercial packaging as the ones she did test.

¶ 23    The trial court found the State proved counts II and III and set the matter for sentencing in October 2021.

¶ 24    Prior to concluding for the day, respondent's counsel made an oral motion for respondent to be released from custody pending sentencing. Counsel noted that respondent had been in custody for 79 days. Counsel also represented that he believed there was a warrant for respondent in Minnesota and, as such, if respondent were to be released, he would "go right into the custody of another jurisdiction." Counsel stated he had "been in touch with [respondent's] family," and he presumed respondent "would return for any sentencing." (Counsel did not state who he had been in touch with or what was discussed.)

¶ 25    The State asked the court to continue to detain respondent because he had been previously reported as a runaway and he had a passport to another country.

¶ 26    The trial court denied respondent's counsel's motion, noting that respondent had

attained the age of 18 and had consequently "been transferred from the detention center to the Adams County jail[.]"

¶ 27                            G. Pretrial Services Bond Report

¶ 28            On October 6, 2021, a "pretrial officer" filed a pretrial services bond report, which stated "[respondent] indicated he does not have a place to stay due to being kicked out of his previous residence." Respondent also reported that he was enrolled in high school in Minnesota. The report stated that "no juvenile criminal history" was located for respondent.

¶ 29                            H. Motion To Reconsider

¶ 30            On October 8, 2021, respondent's counsel filed a motion to reconsider the trial court's findings, arguing, in part, the State failed to present sufficient evidence to establish respondent's intent to deliver the cannabis found in his possession.

¶ 31                            I. Juvenile Social History Report

¶ 32            On October 15, 2021, a probation officer filed a juvenile social history report. According to the report, respondent's parents lived in the same household in Minnesota and respondent lived with them prior to his detention. Respondent spent 19 days in the detention center and was transferred to the jail when he turned 18, where he spent an additional 108 days. Respondent had no prior adjudications or convictions.

¶ 33            The report further stated that on September 14, 2021, the probation officer met with respondent to complete an intake. Respondent was reluctant to provide any information and refused to complete any paperwork. Later, on October 8, 2021, the same officer met with respondent to complete a juvenile social history interview. Respondent again refused to provide any information. The officer noted, "As a result of [respondent's] continuing to refuse to cooperate with this officer, all further information needed to complete the Juvenile Social History Report

was unable to be obtained." The probation officer opined that, given his lack of cooperation, respondent did not appear to be an appropriate candidate for probation.

¶ 34    Attached to the juvenile social history report were various documents, including a summary progress report, which was prepared on July 14, 2021. According to that report, respondent stated upon his admission to the Adams County Detention Center "that he was depressed and that he had previously taken clonidine." While at the detention center, respondent displayed "uncooperative behavior." He was "noncompliant and defiant, often refused to come out of his room." He refused to follow staff directives or participate in programming, repeatedly acted out sexually during room checks, refused to complete "behavioral consequences," had contraband in his room, and was disruptive. The report stated respondent "did not enroll[ ] in the [detention center's educational program] while detained due to his out-of-state status." The report also stated respondent "did not have any appointments or visits while he was detained."

¶ 35    The detention officer who authored the progress report recommended that respondent "be sent back to [his] home state of Minnesota and, due to his behavior, *** receive some sort of mental health services."

¶ 36                    J. The Sentencing Hearing

¶ 37    On October 26, 2021, the trial court conducted a sentencing hearing at which respondent appeared with counsel. The court denied respondent's motion to reconsider and then turned to sentencing. The court received for its consideration the juvenile social history report. No other evidence was presented.

¶ 38    With respect to sentence recommendations, the State observed that respondent had committed serious offenses and may have some problems that he could use "some kind of assistance dealing with." However, the State noted that probation would (1) be transferred to

Minnesota and (2) likely be unsuccessful given respondent's lack of cooperation, specifically his unwillingness to provide information or to answer questions. The State ultimately recommended a sentence of conditional discharge with credit for 108 days served so respondent could be "turned over to authorities in other jurisdictions."

¶ 39    Respondent's counsel provided the following recommendation:

"I believe conditional discharge under the circumstances probably would be the most appropriate sentence. My understanding is he has an outstanding warrant in Iowa. I believe it's related to the vehicle that he was found with here in Illinois. He also has an outstanding warrant in Minnesota for something related to family court regarding his family, a violation of order of protection I believe it is.

That being the case, this young man is not going to be simply plunked out in the street in a foreign state should [Y]our Honor be willing to place him under conditional discharge.

Since I met the young man, there is no doubt there are some mental health issues here. I don't believe they ever rose to the level that it impaired his ability to proceed with the trial, but there are some issues here, no doubt about it. They lend themselves to a little lack of cooperation, not terribly chatty, that's for sure.

But that being the case, you know, Department of Corrections would be wildly inappropriate. It's his first offense as far as I know, his first conviction as far as I know. He is a long way from his support network here in Illinois. To sentence him to DOC under these circumstances I think would simply be cruel.

That being the case, my expectation is he will eventually end up back in Minnesota where he does have a system of care that could provide stabilization,

*et cetera*, and thus make him amenable to successfully completing any term of conditional discharge. With all that in mind, we would ask for conditional discharge under these circumstances."

¶ 40    After hearing the recommendations, the trial court allowed respondent the opportunity to make a statement. Respondent declined. The court then ruled as follows:

"The Court has read and considered the report from the probation office that was prepared for the hearing today. The report is not complete due to the lack of cooperation by the minor and his failure and/or refusal to answer questions to the probation officer. Because of that, we don't have much background information on the minor.

It does appear from the record, though, from the Court, that the probation office would not really have any resources that would be available to or be able to help this minor with the many problems that he seems to have.

We are going to do an order today showing that the minor is being adjudicated as a delinquent ward of the Court, being sentenced to an order of conditional discharge for a return in 35 days. The order would show that the first 30 days of that conditional discharge would be in detention at the Adams County Jail due to the minor's age being age 18. He would be given credit for time previously served, which I believe will satisfy the days in the jail condition of the order.

There is no review date being scheduled right now because, as counsel stated, it does appear that he is going to be transported to other jurisdictions to face other legal issues outside of this county, outside of this state.

The other conditions of conditional discharge would be that the minor would not violate the laws of any city or state, not use or possess any weapon, and not use or possess any controlled substances or alcohol."

¶ 41    Thereafter, respondent's counsel filed a notice of appeal on respondent's behalf.

¶ 42                    K. Order of Discharge

¶ 43    On December 1, 2021, the trial court entered an order of discharge, finding respondent's term of conditional discharge had expired and he had complied with its terms.

¶ 44                        II. ANALYSIS

¶ 45    Respondent appeals, arguing (1) the trial court committed plain error when it failed to *sua sponte* appoint a GAL or, alternatively, his trial counsel provided ineffective assistance by failing to move for the appointment of a GAL; (2) his trial counsel provided ineffective assistance by failing to move to suppress evidence seized incident to his arrest; and (3) the State failed to present sufficient evidence to establish his intent to deliver the cannabis found in his possession. We affirm.

¶ 46            A. The Trial Court's Decision Not To Appoint a GAL

¶ 47    Respondent argues the court should have exercised its discretion to appoint a GAL to represent his welfare and best interests upon learning his parents were not present and had a possible conflict of interest with him. Respondent asserts that the court's failure to do so constitutes second-prong plain error. Specifically, respondent contends the court's failure to appoint a GAL (1) violated his right to due process because it left him without an adult interested in his welfare and best interest and (2) was so serious that it affected the fundamental fairness of the proceeding because the representation of a minor's welfare and best interest by a concerned adult is fundamental in a delinquency proceeding. Respondent argues in the alternative that his counsel

was ineffective for not requesting that a GAL be appointed because counsel could not act both as respondent's attorney and advocate for his best interests.

¶ 48    The State responds that respondent has not established plain error. Specifically, the State contends the trial court's failure to *sua sponte* appoint a GAL did not deprive respondent of his right to due process or amount to clear or obvious error because "there is no requirement that a GAL be appointed in delinquency proceedings" and "the decision to appoint a GAL in a delinquency proceeding is an entirely discretionary decision left to the [trial] court."

¶ 49                                        1. *The Applicable Law*

¶ 50                                        a. Second-Prong Plain Error

¶ 51    The plain-error doctrine is not " 'a general savings clause preserving for review all errors affecting substantial rights whether or not they have been brought to the attention of the trial court.' " *People v. Moon*, 2022 IL 125959, ¶ 21 (quoting *People v. Precup*, 73 Ill. 2d 7, 16, 382 N.E.2d 277 (1978)). "Instead, it is a narrow exception to forfeiture principles designed to protect [a] defendant's rights and the reputation of the judicial process." *Id.*

¶ 52    To establish his claim of second-prong plain error, respondent must show (1) the occurrence of "a clear or obvious error" and (2) that the error " 'was so serious it affected the fairness of [his] trial and challenged the integrity of the judicial process.' " *Id.* ¶¶ 22, 24 (quoting *People v. Sebby*, 2017 IL 119445, ¶ 50, 89 N.E.3d 675).

¶ 53    Second-prong plain error has been equated with "structural error," which is error that "necessarily renders a criminal trial fundamentally unfair or is an unreliable means of determining guilt or innocence." *Id.* ¶ 28. Illinois courts look to the type of errors the United States Supreme Court has identified as structural to determine whether the error being considered is comparable. *Id.* ¶ 30. The Supreme Court has recognized errors as "structural" only in a " 'very

- 11 -

limited class of cases' " (*id.* ¶ 28 (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)), including "a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction." *Id.* ¶ 29 (citing *Washington v. Recuenco*, 548 U.S. 212, 218 n.2 (2006)). " '[T]hese errors deprive defendants of 'basic protections' without which a 'criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence *** and no criminal punishment may be regarded as fundamentally fair.' " *Neder v. United States*, 527 U.S. 1, 8-9 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).

¶ 54          b. Appointment of a GAL in Delinquency Proceedings

¶ 55          A minor in a delinquency proceeding has a nonwaivable right to be represented by a defense attorney. *People v. Austin M.*, 2012 IL 111194, ¶ 73, 975 N.E.2d 22. However, no statutory requirement exists requiring that a GAL be appointed in delinquency proceedings. *Id.* ¶ 71 ("Unlike abuse and neglect proceedings, there is no requirement that a [GAL] be appointed in delinquency proceedings."); compare 705 ILCS 405/2-17 (West 2020) (requiring the court to appoint a GAL if the minor is an alleged abused or neglected child or the victim of a sexual offense), with 705 ILCS 405/5-610(1) (West 2020) (the court may appoint a GAL for a minor if it finds there is a conflict of interest between the minor and parent). Instead, the legislature has reserved the appointment of a GAL in a delinquency proceeding to the sound discretion of the trial court: "The court *may* appoint a [GAL] for the minor whenever it finds that there may be a conflict of interest between the minor and his or her parent, guardian or legal custodian or that it is otherwise in the minor's interest to do so." (Emphasis added.) 705 ILCS 405/5-610(1) (West 2020).

¶ 56          "A trial court abuses its discretion only where its ruling is arbitrary, fanciful or

unreasonable, or where no reasonable person would take the view adopted by the court." (Internal quotation marks omitted.) *In re Gennell C.*, 2012 IL App (4th) 110021, ¶ 11, 968 N.E.2d 1258.

¶ 57                                                 2. *This Case*

¶ 58         The first step in a plain-error analysis is to determine whether any error occurred at all. *Moon*, 2022 IL 125959, ¶ 22. Accordingly, the initial question before this court is whether the trial court abused its discretion by failing to *sua sponte* appoint a GAL to represent respondent. On that question, we acknowledge that the facts of this case raise concern.

¶ 59         For instance, respondent was a runaway from Minnesota who had a warrant out of Iowa and a warrant in Minnesota "for something related to family court regarding his family, a violation of order of protection." Respondent reported that he had a history of depression for which he had taken medication. Additionally, respondent demonstrated belligerent, uncooperative, and offensive behavior at the juvenile detention center. As a result, officials at the detention center, officers from the probation department, and respondent's defense counsel had difficulty obtaining information from respondent. Further, respondent's parents were of little help, having failed to appear for any of respondent's court proceedings. Given these facts, the trial court would have been prudent to appoint a GAL to represent respondent, in addition to his defense counsel. However, an imprudent decision does not necessarily amount to an abuse of discretion, let alone structural error.

¶ 60         Here, the record also establishes that respondent was just 19 days short of his eighteenth birthday when he was detained. As such, respondent was 18 years old at the time of his adjudicatory hearing and sentencing. Upon his release from Adams County, respondent was to be transferred to another jurisdiction to address pending legal issues there. Respondent's counsel, the State, and the trial court all agreed that it was in respondent's best interest to be expeditiously

returned to his home state—where he had the most ties—so he could receive any services he required. And that appears to be what happened.

¶ 61        Notably absent from this case is any suggestion of what a GAL would or could have done that would have made the proceedings more fair to respondent. Respondent's counsel obtained as much information as he could about respondent's family life, legal status in Minnesota, and pending legal matters in other jurisdictions. Respondent's counsel made contact with respondent's family. Afterward, counsel vigorously defended respondent at the adjudicatory hearing. Having failed to obtain an acquittal, counsel did the next best thing he could; he argued for—and obtained—an extremely lenient sentence that expedited respondent's return to his home state where he could be closer to his family and friends, return to his educational setting, and obtain any needed services in a more supportive setting.

¶ 62        Respondent's only suggestion as to how the appointment of a GAL could have benefited him is that a GAL "could advocate for a different outcome based on M.G.'s best interests, such as whether to avoid an adjudicatory hearing and enter a guilty plea." Respondent's argument presumes that respondent's trial counsel did not pursue plea negotiations. It is entirely possible that (1) counsel discussed alternatives short of trial but the State was not agreeable, particularly given the State's comments at sentencing that respondent's offenses were serious, or (2) respondent was unwilling to admit to any of the charges against him.

¶ 63        Respondent relies on *Austin M.* as authority for his argument that the court erred by failing to *sua sponte* appoint a GAL. Specifically, respondent argues that *Austin M.* stands for the proposition that when no interested parent or legal guardian is present or able to represent the child's best interest, the "GAL must act in the role of a concerned parent." However, an examination of the facts and issues in *Austin M.* shows that it has no application to this case.

¶ 64    In *Austin M.*, the State charged brothers Austin M. and Ricky M. with criminal sexual abuse of two other boys who were foster children in the same home. *Austin M.*, 2012 IL 111194, ¶ 5. The parents of Austin M. and Ricky M. hired one attorney to represent both minors, and they were jointly tried. *Id.* The attorney explained to the trial court that he had no objection to allowing the State to present the victims' video statements in lieu of their live testimony because, although the minors' parents denied the offenses occurred, if such actions did happen, " 'it needs to stop.' " *Id.* ¶ 8. Counsel explained that they were " 'seeking the truth' " and did not want to " 'cause trauma to anybody.' " *Id.* Counsel also did not seek to suppress Austin M.'s statement to the police even though he had learning disabilities and diminished mental capabilities. *Id.* ¶ 99. During trial, counsel remarked that they all had " 'the same ultimate goal in mind, and that is the best interests of these kids.' " *Id.* ¶ 97.

¶ 65    After being adjudicated delinquent, Austin M. argued on appeal that he was denied his constitutional right to a defense attorney because the attorney who represented him and his brother performed less as a defense attorney and more as a GAL. *Id.* ¶ 63. The Illinois Supreme Court first reaffirmed a juvenile's right to defense counsel—namely an attorney whose "singular loyalty is to the defense of the juvenile." *Id.* ¶ 77. The court concluded that Austin M.'s attorney did not function as a traditional defense attorney but instead as a GAL. *Id.* ¶ 101. That is, Austin M.'s attorney represented the minor's *and* society's best interests. *Id.* Accordingly, Austin M. did not receive conflict-free representation. *Id.*

¶ 66    The facts and issues in *Austin M.* are vastly different from those before this court. *Austin M.* affirms a minor's right to conflict-free representation by a traditional defense attorney and holds that an attorney cannot simultaneously serve as defense counsel and GAL. *Id.* ¶¶ 77-78. It does not stand for the proposition that a court should *sua sponte* appoint a GAL when a minor's

parents do not appear for delinquency proceedings. In *Austin M.*, the minor had the right to a *defense attorney* but instead got a GAL. In the case before us, respondent had the right to a defense attorney and received a defense attorney—one who gave respondent his undivided loyalty and zealously safeguarded his rights. *Austin M.* does not counsel that respondent was also entitled to the appointment of a GAL. No such statutory right exists, and this court declines to impose one when the legislature has chosen otherwise.

¶ 67     In his argument, respondent also makes repeated reference to a "possible conflict of interest" with his mother. We note that (1) the existence of an order of protection involving his mother was never confirmed and (2) the record is devoid of any details of the circumstances surrounding such an order, if it did in fact exist. Accordingly, respondent's arguments that an order of protection necessarily meant (1) he was abused or neglected, (2) a conflict existed between respondent and his mother, and (3) by extension, a conflict also existed between respondent and his father are logical leaps that lack support in the record. Information about any order of protection (and, consequently, any potential conflict of interest) is absent from the record, and nothing in the record gives us a reason to believe that a GAL would have been able to gather this information when detention officers, probation officers, and respondent's counsel could not.

¶ 68     We make clear that our analysis should not be read as an endorsement of the actions—or lack thereof—of the trial court, respondent's counsel, or the State. Respondent's counsel, upon realizing that respondent's parents were not appearing, should have asked for a GAL to be appointed. This is particularly true here, where respondent (1) was uncooperative, (2) reported experiencing depression, and (3) had run away from home for several weeks, after allegedly getting an order of protection against a parent. Likewise, the State could have made such a suggestion, which would have served the interests of justice and protected the adjudication of

delinquency from attack on appeal. Finally, the trial court could have inquired further when it became clear that respondent's parents would not be present and asked the parties if they thought appointing a GAL would be appropriate. Given the *unique* circumstances of this case, the best practice would have been for the court to exercise its discretion by appointing a GAL.

¶ 69 However, after considering the totality of the circumstances of this unique case, we cannot conclude that the trial court's failure to *sua sponte* appoint a GAL was arbitrary, fanciful, or unreasonable or that no reasonable person would have taken the same view. Because the trial court did not commit any error, there is no plain error, and respondent's claim fails.

¶ 70 For the same reasons, respondent's counsel was not ineffective for failing to request the appointment of a GAL.

¶ 71 B. Defense Counsel's Decision Not To File a Motion To Suppress Evidence

¶ 72 Respondent next argues that his trial counsel was ineffective for failing to file a motion to suppress the evidence that was seized incident to respondent's arrest. Respondent claims that Downs did not have probable cause to make the arrest and, as a result, had counsel filed such a motion, the evidence would have been suppressed and respondent would have been acquitted.

¶ 73 The State responds that respondent was lawfully arrested and searched and, accordingly, any motion to suppress would have been meritless. We agree with the State.

¶ 74 1. *The Applicable Law*

¶ 75 a. Ineffective Assistance of Counsel

¶ 76 A minor charged with committing an offense is entitled to the effective assistance of counsel in delinquency proceedings. *In re Danielle J.*, 2013 IL 110810, ¶ 31, 1 N.E.3d 510. Ineffective assistance of counsel claims are analyzed under the *Strickland* standard used in criminal cases. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

¶ 77        "To establish a claim of ineffective assistance of counsel, the [respondent] must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 81, 126 N.E.3d 703. " '[A] court will not find that defense counsel was ineffective for failing to file a meritless motion to suppress.' " *People v. Rowell*, 2021 IL App (4th) 180819, ¶ 21, 182 N.E.3d 806 (quoting *People v. McIntosh*, 2020 IL App (5th) 170068, ¶ 54, 146 N.E.3d 813). Accordingly, a reviewing court must determine, based upon the record before it, whether a motion to suppress would have been meritless. *Rowell*, 2021 IL App (4th) 180819, ¶ 21. In this case, that determination turns on whether there was probable cause for respondent's arrest.

¶ 78                                      b. Search and Seizure

¶ 79        All persons enjoy the right to be free from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. An arrest supported by probable cause does not constitute an unreasonable seizure. *People v. Gherna*, 203 Ill. 2d 165, 177, 784 N.E.2d 799, 806 (2003). "Probable cause exists when the facts and circumstances known by the arresting officer are sufficient to warrant a reasonable person's belief that the arrested individual has committed an offense." *Id.*

¶ 80        A search of a suspect's person and the area within his immediate control, incident to a lawful arrest, does not violate the fourth amendment. *People v. Cregan*, 2014 IL 113600, ¶¶ 25, 28, 10 N.E.3d 1196. "It is the fact of the lawful arrest which establishes the authority to search." *People v. Rossi*, 102 Ill. App. 3d 1069, 1073, 430 N.E.2d 233, 236 (1981). "Furthermore, such a search may be made immediately prior to the arrest and need not take place subsequent to it." *Id.* (citing *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980)).

¶ 81                                    2. *This Case*

¶ 82        At the adjudicatory hearing, Downs testified that on the day of the offense, around

4 a.m., he saw a truck in the Applebee's parking lot with its hazard lights on and front-end damage. Downs testified that he observed cannabis on the dashboard in plain view. A civilian gave Downs a description of the suspect and the direction the suspect went. Downs located respondent nearby "in timber just east" of the business located next to the Applebee's restaurant and found him to have a Ford key around his neck. Downs "took [respondent] into custody or detained him" and searched his person and the backpack he was carrying. Inside of the backpack, Downs found 22 sealed packages of suspected cannabis and a bottle of alcohol that was half-full. Downs determined that the key indeed belonged to the truck in the Applebee's parking lot.

¶ 83        We note that when, as here, respondent raises an ineffective assistance of counsel claim based upon a failure to file a motion to suppress, the record "will rarely show all of the information the police had or the reasons explaining their actions because—*** in the absence of a motion to suppress—there would be no reason for the State to present such evidence." *People v. Eyler*, 2019 IL App (4th) 170064, ¶ 36, 153 N.E.3d 1012. In such a case, a respondent "is asking [the] court to assume that no further evidence could have been presented to justify the search that occurred." *Id.* In this case, however, the record includes a police report written by Downs that provides additional details for this court to consider when assessing his decision to arrest respondent.

¶ 84        In his report, Downs additionally describes that, after seeing the cannabis on the dashboard, the civilian witness (an Area Disposal employee) told him a black male wearing a gray sweatshirt and black backpack had been near the truck and walked in a southerly direction. Another civilian told Downs that a black male with a black backpack was behind the Mr. Deal store, which is located next to the Applebee's. Another officer who arrived to assist saw respondent running in timber next to Mr. Deal's. The officer identified himself as law enforcement and ordered

respondent to stop running. A short foot chase ensued, and respondent was subdued. He was wearing a gray sweatshirt and black backpack.

¶ 85        Based upon these facts, Downs had probable cause to arrest respondent for illegally possessing the cannabis that Downs had viewed in plain sight on the dashboard of the truck. As the State correctly notes, under section 11-502.15 of the Illinois Vehicle Code, no driver or passenger may possess cannabis within a motor vehicle unless it is secured in "a sealed or resealable, odor-proof, child-resistant cannabis container that is inaccessible." 625 ILCS 5/11-502.15(b), (c) (West 2020). A violation of this statute is a class A misdemeanor. *Id.* § 11-502.15(d).

¶ 86        When Downs observed the cannabis "blunts" or "tips" on the dashboard, he had reason to believe that *someone* had violated section 11-502.15(b) or (c). Then, Downs received information from one civilian witness that a black male wearing a gray hoodie and black backpack had been the sole occupant of the truck, and he received information from another civilian that the same male was behind Mr. Deal's. Downs then found respondent wearing a gray hoodie and black backpack in the woods at 4 a.m. behind Mr. Deal's. Respondent ran when the police identified themselves as law enforcement officers.

¶ 87        At this point, Downs was in possession of sufficient facts to believe respondent had committed the offense of illegal possession of cannabis in a motor vehicle in violation of section 11-502.15. As such, Downs's arrest of respondent and search of his person and backpack incident to that arrest did not violate the fourth amendment, and any motion to suppress would have been meritless. Accordingly, respondent's trial counsel was not ineffective for failing to file such a motion.

¶ 88                C. Evidence of Respondent's Intent To Deliver

¶ 89        Last, respondent argues on appeal that that his conviction for possession with intent

to deliver cannabis cannot stand because his mere possession of 22 individual packages of cannabis, in commercial packaging, was insufficient proof for a rational trier of fact to find beyond a reasonable doubt that he intended to deliver it. We disagree.

¶ 90                                              1. *The Applicable Law*

¶ 91          When considering a challenge to the sufficiency of the evidence, a reviewing court must "(1) consider all of the evidence in the light most favorable to the State and (2) determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 54. "Every reasonable hypothesis of innocence need not be excluded to sustain conviction." *People v. Cordle*, 210 Ill. App. 3d 740, 741, 569 N.E.2d 209, 210 (1991). "It is not the function of [a reviewing court] to retry a defendant when considering a challenge to the sufficiency of the evidence." *People v. Steidl*, 142 Ill. 2d 204, 226, 568 N.E.2d 837, 845 (1991).

¶ 92          To prove respondent guilty of possession with intent to deliver cannabis, the State needed to establish that respondent (1) knew of the cannabis, (2) possessed the cannabis, and (3) intended to deliver the cannabis. 720 ILCS 550/5(d) (West 2020). Respondent concedes he knew of and possessed the cannabis and challenges only the third element.

¶ 93          "[A] reasonable inference of the intent to deliver may arise from possession of a quantity of drugs in excess of that needed for personal use." *Cordle*, 210 Ill. App. 3d at 741. Accordingly, "the amount of cannabis alone, without any additional evidence [such as scales, baggies, packaging for delivery, or prior deliveries], is sufficient to support a finding of possession with intent to deliver." *Id.* at 742. The presence of such additional evidence "merely strengthens the inference." *Id.*

¶ 94                                              2. *This Case*

¶ 95    We agree with the State that, when viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that respondent intended to deliver the cannabis found in his possession. Respondent possessed a total of 77 grams of cannabis separated into 22 packages, each containing 3.5 grams of cannabis. Both (1) the total amount of the cannabis and (2) the individual packaging support the conclusion that the cannabis was not intended for personal use but instead for delivery.

¶ 96    Because the "reasonable inferences to be drawn from the evidence are the responsibility of the fact finder" and it is not this court's function to retry the respondent, we conclude that the evidence was sufficient to prove the element of the respondent's intent to deliver. *Steidl*, 142 Ill. 2d at 226

¶ 97                                    III. CONCLUSION

¶ 98    For the reasons stated, we affirm the trial court's judgment.

¶ 99    Affirmed.

¶ 100    PRESIDING JUSTICE KNECHT, dissenting:

¶ 101    As the majority notes, there is no statutory requirement a guardian *ad litem* be appointed in a delinquency proceeding. It is left to the discretion of the trial court.

¶ 102    However, a 17-year-old runaway from Minnesota who apparently stole a vehicle in Iowa, and had no parent or concerned adult present to represent his welfare and best interests in an Illinois court, would appear to be a likely candidate for a GAL.

¶ 103    Let us add the fact the minor was born in another country and had a Liberian passport. His parents gave no one any explanation about their unwillingness or inability to appear in court. The minor was uncooperative with probation staff, his lawyer, and the detention center staff in that he failed to provide meaningful information to any of them. It is suggested he had an

order of protection against his mother, but no one verified the existence of the order or acquired any information from Minnesota about its existence or why it may have been issued.

¶ 104 Further, he exhibited unruly behavior in custody, appeared to have mental health issues, was involved with drugs (marijuana), and stated he was depressed and had previously taken clonidine. While in detention he was disruptive, acted out sexually during room checks, and did not participate in any programming. The detention center staff made no recommendations as to what should happen to the minor after adjudication other than sending him back to Minnesota with the suggestion he receive "some sort of mental health services."

¶ 105 I suggest he not only should have had a GAL but should also have been examined for fitness and provided mental health services while in custody for over 100 days. It was an abuse of discretion for the trial court to fail to appoint a guardian *ad litem*, and that failure undermined the integrity and spirit of our system. The trial court, the prosecutor, the defense attorney, and respondent would have all benefitted from a guardian *ad litem* who could have helped fill in the paucity of information about respondent. Instead, he was discharged with everyone hoping he would go back to Minnesota. He was a throw away, a discard from our system.

**No. 4-21-0679**

| | |
|---|---|
| **Cite as:** | *In re M.G.*, 2022 IL App (4th) 210679 |
| **Decision Under Review:** | Appeal from the Circuit Court of Adams County, No. 21-JD-19; the Hon. John C. Wooleyhan, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Jessica L. Harris, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Gary L. Farha, State's Attorney, of Quincy (Patrick Delfino, David J. Robinson, and John M. Zimmerman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |